[Civ. No. 55474. Second Dist., Div. Three. Sept. 25, 1979.]

ARNOLD W. WYNNER, Cross-complainant and Appellant, v.
ALFRED C. BUXTON, Cross-defendant and Respondent.

COUNSEL

Herbert Papenfuss for Cross-complainant and Appellant.

Rodd Kelsey for Cross-defendant and Respondent.

OPINION

POTTER, Acting P. J.—Cross-complainant Arnold W. Wynner appeals from a summary judgment in favor of cross-defendant Alfred C. Buxton, dismissing Wynner's cross-complaint as to Buxton. The cross-complaint sought damages from several named participants in the construction of a self-service gas station on Van Nuys Boulevard in the City of Los Angeles. The project as commenced was owned by a partnership of which Wynner and one Martin Evans were partners. Subsequently, Wynner purchased all of Evans' interest and continued as a sole proprietor.

The station was constructed pursuant to an oral agreement between Wynner and cross-defendant West Pac Steel Contractors "which provided that WEST PAC would provide the engineering, obtain the building permits, erect . . . [and] provide supervision for the erection of the proposed gas station. . . ." According to the cross-complaint, Buxton prepared the "plans and calculations and specifications for the proposed work of improvement" and said plans and calculations and specifications "were so negligently prepared that the same violated building codes, fire codes, and were not prepared in a substantial and workmanlike manner so as to accomplish the work of improvement contemplated by the agreement between WYNNER and WEST PAC."

Various deficiencies in the project were specified. Only two of these deficiencies related to the buildings. The allegations in this respect were: "[B]uildings placed upon the job site leak; buildings placed upon the job

site are smaller in interior dimension than called for by plans and specifications; . . ." The other deficiencies related to the fuel storage and delivery equipment (broken fuel lines from fuel storage tanks that shifted and moved), concrete and asphalt ground coverings failing by virtue of improperly compacted fill, and improper provision for drainage.

Buxton made two motions for summary judgment, the first of which was denied without prejudice, and the second of which was granted. Buxton's declaration in support of the first motion showed that his relationship to the project was limited to making certain design calculations "pertaining to the steel canopy, the steel cash booth and the steel store room . . . ." These services were rendered in his capacity as a registered professional engineer and as an independent contractor with West Pac Steel Contractors. The declaration specifically denied preparing "any plans, drawings or specifications" except the specifications inherent in the structural calculations. The declaration admitted that Buxton's seal as a registered engineer "appears on some of the drawings pertaining to the work of improvement as a whole" but explained that the reason he placed his seal on said drawings was "solely because of a formal requirement of the Building and Safety Department of the City of Los Angeles."

The opposition affidavit of Wynner specified four documents which bore Buxton's seal and were used to obtain building permits. These were plans entitled:

"1. General Arrangement;

"2. Framing Plan for 40 X 48 Canopy;

"3. 6 X 10 Equipment Building, Block Wall Rear, and 2″ Stone Veneer;

"4. 6 X 13 Cash Booth; . . ."

Buxton's second motion for summary judgment was supported by his declaration which virtually repeated the allegations of the original declaration to the effect that Buxton's sole involvement in the project was in making "structural calculations" for the structural steel for the canopy and the roofs of the cash booth and store room, and that he had not prepared any of the plans, drawings or specifications employed in the construction of the gas station. In addition, the documents described in Wynner's declaration as bearing Buxton's seal were described in detail. From this description it appears that the so-called "General Arrangement" is simply "a plot plan or layout of the project showing the *location*

of structures in relation to property lines and each other." Though the location of each of the three buildings, of the fuel tanks, and of the areas to be covered with paving is shown, this plot plan does not purport to show any details as to drainage, compaction of underlying soil or the piping or fuel lines. As to the latter details, specific reference is made to the necessity for a separate permit.

Buxton's declaration also describes the two sheets of the framing plan for the canopy. The first page sets forth the roof plan and two elevations, side and end. Also depicted are the footing layouts for the supporting columns. It contains no details relating to ground elevation, drainage, fuel lines, storage tanks or other features in respect of which deficiencies were alleged. Sheet two shows connection details for the structural steel, and details for the sheet metal fascia, gutters, beam covers and metal roof decking.

The 6 x 10 equipment building plan is described as depicting only the concrete slab foundation and metal walls with an anchor bolt layout for attaching the walls to the slab.

The cash booth plan is described as showing "the metal building, windows, doors, concrete slab foundation" but "no piping, no grades, ground elevation or other details pertaining in any way" to the deficiencies asserted by Wynner.

The declaration also states that any leakage in such sheet metal structures as shown on these plans "could happen only as a result of faulty workmanship."

Buxton's declaration also analyzes Wynner's complaints and shows that they "are totally unrelated to [his] calculations for the structural parts of the canopy, cash booth and store room."

The Buxton declaration then proceeds to explain the reference in his declaration in support of the original motion for summary judgment to the fact that his seal was placed on the drawings "solely because of a formal requirement of the Building and Safety Department of the City of Los Angeles" by referring to the provisions of section 91.0210 of the Los Angeles Building Code, a portion of paragraph (b) thereof being quoted.[1]

---

[1]The provisions of Los Angeles Municipal Code section 91.0210, subdivision (b), are as follows: "When a structural design is required for the purpose of obtaining a permit, it shall be justified by a written record of computations filed with the Department and each

Buxton's declaration further points out that none of the plans signed by him contain any "indication whatever of the direction in which the paving is to drain," and that they likewise contain "no specifications as to compaction of the underlying soil." The declaration summarizes by stating that there is nothing in any of the drawings bearing Buxton's signature "which is related directly or indirectly to any of Wynner's complaints, with the single exception of the standard sheet metal construction details on the drawing entitled '6' x 13', Cash Booth,' and in that respect any complaint would have to be predicated upon faulty workmanship rather than design."

Wynner's opposition declaration repeats the prior declaration insofar as it describes the plans and the alleged defects in the construction of the project. Beyond that, the declaration merely collects: (1) unsworn statements in the form of letters from two civil engineering firms to plaintiff, stating details of the condition of the property and the causes of deficiencies, the steps to be taken to remedy same and, in one instance, a legal opinion by the civil engineer as to the effect of Buxton's signature on the general arrangement drawings without structural details,[2] and (2) Wynner's letter to Buxton enumerating his contentions respecting Buxton's alleged breach of duty.

The Wynner declaration also states that none of the plans "set forth notes or specifications which direct the persons performing the actual construction how their work was to be done so as to conform to code" and that they contained merely general references to the fact that various components were "to conform to 'City Code.' "

After oral argument the court granted Buxton's motion; this was followed by the judgment dismissing the cross-complaint as to Buxton.

### Contentions

Wynner contends that (1) Buxton's declarations are insufficient to establish the lack of causation between the engineering calculations made

sheet of the drawings and written record of computations shall be signed by or bear the approved stamp of an engineer or architect licensed by the State of California for the type of service performed. On structures which do not require engineers or architects signatures according to Article 3, Chapter 7 of the State Civil and Professional Engineers Act but do require some structural design, the person responsible for such design shall sign the calculations and the sheets of the plans having engineering details thereon."

[2]This opinion was to the effect that by so signing, Buxton assumed "responsible charge" of the entire project, including supervision.

by him and the defects in the construction; (2) the plans signed by Buxton were his responsibility and they were defective in failing to show mechanical details pertaining to the product storage and delivery system, soil compaction and drainage; and (3) Buxton was chargeable with the duty of supervision of the entire project as a matter of law by virtue of his signing of plans.

Buxton controverts all of Wynner's contentions.

*Discussion*

*Summary*

The Buxton declarations were sufficient to show lack of causal connection between any of the engineering calculations made by him and the project's defects of which Wynner complained. Buxton was responsible for the plans that were signed by him, but such plans were not defective in their omission of details concerning mechanical elements, soil compaction and drainage, with which they did not deal at all. The uncontradicted facts clearly showed that Buxton did not assume responsibility for supervision of the project. Consequently, the summary judgment was properly granted.

*The Buxton Declarations Were*
*Sufficient to Show Lack of*
*Causation Between His Work*
*and the Project Defects*

■ Wynner correctly points out that: (1) in reviewing the summary judgment, this court must resolve all doubts as to the propriety of granting the motion in his favor (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]), and (2) Buxton, as the moving party, had the burden to establish all elements necessary to sustain a judgment in his favor (*Beech Aircraft Corp.* v. *Superior Court* (1976) 61 Cal.App.3d 501, 520 [132 Cal.Rptr. 541]), including issues as to which Wynner had the burden of proof (*Barnes* v. *Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444]). Furthermore, he correctly asserts that "[t]he affidavits of the moving party are strictly construed." (*Orsetti* v. *City of Fremont* (1978) 80 Cal.App.3d 961, 966 [146 Cal.Rptr. 75].)

■ The above rules, however, do not mean that competent opinion evidence by an expert which is wholly uncontradicted by any contrary

opinion submitted in behalf of the opposing party does not support the granting of a summary judgment. The only requirement stated in Code of Civil Procedure section 437c is that: "Supporting and opposing affidavits or declarations shall be made by any person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Wynner's argument that "[e]xamples of inadmissible evidence include conclusions and opinions" is unsupported by any authority excluding competent expert opinion testimony. Such opinion testimony is expressly made admissible by Evidence Code section 801.

Buxton's declarations show that he was a registered professional engineer with 25 years of experience related to gasoline service stations. This experience certainly qualified him to give competent opinions with respect to such matters as the cause of leaks in steel structures employing "standard sheet metal construction." Such experience also clearly qualified him to state opinions concerning whether any of the alleged defects in the project related in any way to the matters shown on the drawings upon which his seal and signature appeared.

Buxton's declaration clearly stated his expert opinion that the building leaks were the result of faulty workmanship, not the standard sheet metal construction specified in the plans, and that there was nothing in any of the drawings related to Wynner's complaints.

Wynner did not attempt to contradict any of the opinions above set forth. We may decide this appeal, therefore, on the assumption that none of the deficiencies in the project were the result of carrying out work shown on the four plans signed by Buxton in accordance with any directive contained thereon, and that all of the project deficiencies were the result of either departures from such plans or departures from Building Code requirements or sound practice with respect to details with which such plans did not purport to deal.

■ *The Omission of Engineering and Other Details From the Plans Signed by Buxton Do Not Render Them Defective*

The Buxton declaration shows that the four plans signed and sealed by him did not purport to depict any details with respect to the mechanical

components of the product storage and delivery system nor any details as to soil compaction or drainage. They pertained only to (1) the general arrangement, that is, the relationship of the various component structures to each other and to the property lines, and (2) to the construction of the three steel frame and sheet metal structures included. By referring to the necessity for a separate permit with respect to the product storage and by noting that various elements were "to conform to 'City Code,' " the general arrangement plan clearly indicated that there were numerous details with which it did not deal, and that it was precisely what it purported to be, merely an indication of the "[g]eneral [a]rrangement" of the elements of the project.

We are satisfied that by signing and sealing these plans, Buxton assumed responsibility for such plans. Business and Professions Code section 6731 defines civil engineering as embracing "[t]he preparation and/or submission of designs, plans and specifications and engineering reports" with respect to "fixed works for . . . framed and homogeneous structures, buildings, or bridges," and Business and Professions Code section 6735 requires that "[a]ll civil engineering plans, specifications, reports or documents shall be prepared by a registered civil engineer or by a subordinate employee under his direction, *and shall be signed by him to indicate his responsibility for them.*" (Italics added.)

Insofar as the plans related to the three steel frame buildings, they were expressly excluded from the statutory exemption for one-story buildings of limited span provided by Business and Professions Code section 6737.1. Thus, Buxton's contention that these documents were signed by him solely in compliance with the provisions of Los Angeles Municipal Code section 91.0210, subdivision (b) (requiring persons responsible for structural designs to sign plans "[o]n structures which do not require engineers or architects signatures" according to chapter 7 of division 3 of the Business and Professions Code) is untenable. His signature on the plans for the steel structures was required and such signature did "indicate his responsibility for them." Thus, if the plans were defective, and such defect resulted in deficiencies in the project, Buxton would be responsible.

It does not follow, however, that Buxton's "responsibility" for the "civil engineering plans" required for the three steel structures necessarily makes him responsible for all the plans covering all aspects of the project, nor that the failure of such civil engineering plans to include all details governing every aspect of the project renders them defective. These

consequences would follow as a necessary legal conclusion only if, as a matter of law, all plans relating to a project embodying any nonexempt structure are required to be prepared by a professional engineer.

But this is not so. Business and Professions Code section 6737.4 permits a licensed contractor to prepare "electrical or mechanical shop or field drawings for work which he has contracted to perform." It thus clearly contemplates that civil engineering plans for the basic structure may properly be prepared omitting all mechanical and electrical details which may be supplied by the mechanical or electrical contractor. The reference in the Buxton declaration to "the common practice in the construction industry to have drawings containing details regarding mechanical work (such as plumbing, fuel pipes, tanks, etc.) prepared pursuant to a permit from the city's department of building and safety based on drawings prepared by the mechanical contractor" is simply a reference to the engineering practice taking advantage of this exemption.

Furthermore, Business and Professions Code section 6737.1, subdivision (d), clearly provides for an exemption relating to portions of a project (one-story wood frame structures included therein) with the result that a multi-building project consisting in part of steel frame or concrete buildings, and in part of wood frame buildings, could lawfully, as to the latter, be designed by nonprofessional engineers.

The deficiencies specified in Wynner's declaration for the most part relate to the mechanical engineering aspects of the project. For example, as noted in Wynner's opposition, the proper standards for materials to support the tanks and pipes are stated in section 5.125 of the Uniform Mechanical Code. These details were properly omitted from the civil engineering plans to be included in mechanical engineering plans prepared by the mechanical contractor pursuant to Business and Professions Code section 6737.4.

The absence of any specific details on the plans for grading or drainage is in the same category. Civil engineering plans embodying such details appear to be required only where an excavation and grading permit is a legal requirement. Uniform Building Code (1973 ed.) section 7006,[3] subdivision (c), page 657, states: "When required by the Building Official, each application for a grading permit shall be accompanied by two sets of plans and specifications, and supporting data consisting of a soil

---

[3]The provisions of section 7006 of the Uniform Building Code are incorporated by title 24, California Administrative Code, section B-2900.

engineering report and engineering geology report. The plans and specifications shall be prepared and signed by a civil engineer when *required by the Building Official.*" (Italics added.)

It is obvious that if there was grading which required a permit in this case, the building official did not call for plans and specifications signed by a civil engineer or Wynner's statement that the project plans did not include any such documents would be false.

From the foregoing, we conclude that Buxton's approval and signature of plans limited to those portions of the project which required plans approved by a professional engineer, which plans omitted details of the project not requiring his participation, was not the approval of defective civil engineering plans.

*Buxton Was Not "In Responsible*
*Charge" of the Project*

Wynner's argument that Buxton was "in responsible charge" is based upon Buxton's having signed the above described plan. He quotes from Business and Professions Code section 6735 the requirement that civil engineering plans " 'shall be prepared by a registered Civil Engineer . . . and shall be signed by him to indicate his *responsibility* for them,' " and he also states, "The Code also provides that a Civil Engineer who signs plans and specifications is in 'responsible charge' *of the work in question.* (B & P Code, Sec. 6732(k))." (Italics added.) Business and Professions Code section 6732 contains no such provision and has no subdivision (k), nor do any other provisions of the code so provide.

■ Wynner's reliance on Business and Professions Code section 6735 is misplaced. As above noted, it does make the civil engineer responsible for the plans which he signs. The responsibility for plans, however, is in no way necessarily connected with responsibility for the execution of the work shown by the plan, which is supervision. Though supervision is within the scope of the professional capacity of engineers, as in the case of architects, preparation of plans does not impose a duty to supervise. (*Wallich* v. *Salkin* (1963) 219 Cal.App.2d 157, 162-163 [33 Cal.Rptr. 125].)

Wynner also refers to title 16, chapter 5 of the California Administrative Code, section 404.1, subdivision (c).[4] This section merely defines

---

[4]Though the brief cites section 401.1(c), the matter quoted actually appears in section 404.1.

what being in "responsible charge" means; it in no respect defines how one assumes such status.

The decision in *Professional Engineers in California Government* v. *State Personnel Bd.* (1977) 70 Cal.App.3d 346 [137 Cal.Rptr. 110], upon which Wynner relies, does not support a conclusion contrary to that stated in *Wallich.* In upholding a State Personnel Board decision combining a professional engineering job class with a nonprofessional technician job class, the court made the following comment as to the difference between professional engineers and subordinates (*id.,* at p. 350): "In short, the difference between an 'engineer' who must be registered and a 'subordinate' who need not be, is responsibility. Responsibility, and specifically the phrase 'responsible charge of work' means 'the independent control and direction, by the use of initiative, skill, and independent judgment, of the investigation or design of professional engineering work or the direct engineering control of such projects.' (§ 6703.)[1]"

This statement makes it clear that there are two separate functions of the professional engineer embraced in the term "responsible charge of work." One relates to the control of design and the other relates to the control of the execution of the project. Though only a professional engineer (or architect) can exercise either control, nothing in the court's statement suggests that by undertaking either function an engineer assumes responsibility for both.

Nor does Wynner's assertion that Buxton assumed responsibility for supervision find support in the conclusory statement in the professional engineer's letter attached to his opposition declaration. This letter is not competent to prove anything; it is unverified and in this respect states a legal conclusion contrary to the authorities above noted.

Buxton's uncontradicted declaration showed that he was not employed to provide any supervision; his signing the plans created no such

---

"[1]The State Board of Registration for Professional Engineers has further defined the meaning of the term 'responsible charge.' (Cal. Admin. Code, tit., 16, § 404.1.) This section of the Administrative Code became effective on March 6, 1977. Without analyzing the section in detail, it is obviously designed to necessitate a high degree of personal involvement on the part of the engineer claimed to be in 'responsible charge' of a project."

obligation. Liability cannot, therefore, be predicated upon the fact that in executing the project, West Pac, or others, failed to comply with the plans or with any legal requirements for the accomplishment of the work shown thereon.

The judgment is affirmed.

Cobey, J., and Allport, J., concurred.