[No. D006578. Fourth Dist., Div. One. July 28, 1988.]

SHERUE RILEY, Plaintiff and Appellant, v.
SOUTHWEST MARINE, INC., Defendant and Respondent.

COUNSEL

Bacalski, Holdway & Prindle and Patrick L. Prindle for Plaintiff and Appellant.

Littler, Mendelson, Fastiff & Tichy, James J. McMullen, Jr., and Roy D. Axelrod for Defendant and Respondent.

OPINION

KREMER, P. J.—Sherue Riley appeals the granting of a summary judgment to Southwest Marine, Inc., on his tort claims for personal injuries received while he was working at Southwest Marine. On appeal, Riley contends the trial court erred in determining Southwest Marine was his employer as a matter of law and in ruling he was statutorily barred from bringing a tort action against Southwest Marine. We find no errors and therefore affirm.

## FACTS

In August or September 1982, Riley signed up with Manpower, Inc., a labor broker. Manpower sent Riley to Southwest Marine for work as a general laborer. Manpower paid Riley $4 per hour.[1] Manpower did not provide Riley with any training, safety equipment, work tools or supervision for his work at Southwest Marine. Manpower dealt only with payroll matters, issuing Riley a check on submission of time cards and taking care of withholding social security, federal and state taxes, and paying premiums for unemployment insurance, workers' compensation and Longshoremen's and Harbor Workers' Compensation Act (LHWCA) (33 U.S.C. § 901 et seq.)[2] insurance. When Riley went to Southwest Marine, Southwest Marine gave him a preemployment physical examination. Southwest Marine trained him, provided all safety equipment and work tools, gave daily job instructions and supervised his work.

On March 7, 1983, Riley was injured while working on the repair and refurbishing of an ocean-going tug at Southwest Marine. In August 1983,

---

[1] Under Manpower's arrangement with Southwest Marine, Manpower billed Southwest Marine based on the number of hours worked by Manpower employees. The hourly rate charged to Southwest Marine depended on which shift was worked (first or second) and the total number of hours worked by Manpower employees (varying on the first shift from $6.64 per hour if Manpower employee hours were 400 hours or less, to $5.88 per hour if the total hours were 1600 or more).

[2] All statutory references are to the LHWCA unless otherwise specified.

Riley filed an employee's claim for compensation, citing the LHWCA and listing Southwest Marine as his employer. He amended his claim in February 1984 to add Manpower as an employer. Riley apparently received workers compensation benefits.

Also in February 1984, Riley sued Southwest Marine in tort for his injuries based on theories of negligence, failure to provide proper safety equipment and products liability. In January 1987, he amended his complaint to add causes of action based on breach of statutory duty, breach of contract, ultra hazardous activity, failure to warn, negligent supervision, negligent training and failure to provide a safe place of employment. All these causes of action were based on the theory that he was not a Southwest Marine employee and therefore was not limited to a remedy in the nature of workers' compensation, specifically to recovery under the LHWCA.[3] Southwest Marine moved for summary judgment, contending it was Riley's employer under the "special employment" or "borrowed servant" doctrine and therefore was immune from tort liability under the LHWCA. The trial court agreed and granted summary judgment to Southwest Marine.

### DISCUSSION

#### I

Riley contends summary judgment was improper because the question of whether a "special employment" relationship existed between himself and Southwest Marine was a factual matter which could not be resolved by summary judgment.

A "special employment" relationship arises when an employer lends an employee to another employer and relinquishes to the borrowing employer all right of control over the employee's activities. (*Marsh* v. *Tilley Steel Co.* (1980) 26 Cal.3d 486, 492 [162 Cal.Rptr. 320, 606 P.2d 355].) The

---

[3] Riley apparently received workers' compensation from the state. (See Riley's deposition testimony, referring to his receiving workers' compensation from the "State Fund.") Southwest Marine's motion for summary judgment was based on Riley being limited to the exclusive remedy provided by the LHWCA. The trial court granted summary judgment "based upon the ground that Defendant was the special employer of Plaintiff and therefore Plaintiff's exclusive remedy would be pursuant to the applicable workers' compensation statutes." In support, the trial court cited two cases interpreting the LHWCA: *Doucet* v. *Gulf Oil Corp.* (5th Cir. 1986) 783 F.2d 518, certiorari denied 479 U.S. 883 [93 L.Ed.2d 249, 107 S.Ct. 272] and *Gaudet* v. *Exxon Corp.* (5th Cir. 1977) 562 F.2d 351, certiorari denied 436 U.S. 913 [56 L.Ed.2d 414, 98 S.Ct. 2253].

As used in this opinion, "a remedy in the nature of workers' compensation" encompasses both the state workers' compensation remedy as well as the LHWCA workers' compensation remedy to distinguish the statutory remedy from a tort remedy.

borrowed employee is " 'held to have two employers—his original or "general" employer and a second, the "special" employer.' " (*Kowalski* v. *Shell Oil Co.* (1979) 23 Cal.3d 168, 174 [151 Cal.Rptr. 671, 588 P.2d 811].) In this dual employer situation, the employee is generally limited to a statutory workers' compensation remedy for injuries he receives in the course of his employment with the special employer; he may not bring a separate tort action against either employer. (See, e.g., *Hebron* v. *Union Oil Co. of California* (5th Cir. 1981) 634 F.2d 245, 248; *Jones* v. *Kaiser Industries Corp.* (1987) 43 Cal.3d 552, 556 [237 Cal.Rptr. 568, 737 P.2d 771]; 33 U.S.C. § 905(a); Lab. Code, § 3600.)

■ The aim of the summary judgment procedure is to discover whether the parties possess evidence requiring the fact-weighing procedures of a trial. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953].) In reviewing the propriety of a summary judgment, the appellate court must resolve all doubts in favor of the party opposing the judgment. (*Wynner* v. *Buxton* (1979) 97 Cal.App.3d 166, 172 [158 Cal.Rptr. 587].) The reviewing court conducts a de novo examination to see whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law. (*Lichty* v. *Sickels* (1983) 149 Cal.App.3d 696, 699 [197 Cal.Rptr. 137].)
■ While "[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be granted only if there is no issue of triable fact" (*Brose* v. *Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 [228 Cal.Rptr. 620]), it is also true that "[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one." (*Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 507 [86 Cal.Rptr. 744].)

■ The question of whether an employment relationship exists " 'is generally a question reserved for the trier of fact.' " (*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d 486, 493; *Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d 168, 175.) This remains true "[w]here the evidence, though not in conflict, permits conflicting inferences." (*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d at p. 493.) However, if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists becomes a question of law which may be resolved by summary judgment. (*Santa Cruz Poultry, Inc.* v. *Superior Court* (1987) 194 Cal.App.3d 575 [239 Cal.Rptr. 578]; *Gaudet* v. *Exxon Corp., supra,* 562 F.2d 351.)[4]

---

[4] Riley asserts the trial court erroneously relied on the *Santa Cruz Poultry* and *Gaudet* cases as well as on *Doucet* v. *Gulf Oil Corp., supra,* 783 F.2d 518 for the proposition the special employment relationship can be determined as a matter of law. He argues *Gaudet* and *Doucet* are inapplicable because they were "founded upon Louisiana [and Fifth Circuit] law providing that determination of the employee/employer relationship presents a legal, not fac-

Riley's assertion there exists a factual dispute requiring resolution by a trial rests on his deposition testimony that he did not "consider [himself] to be an employee of Southwest Marine during that period of time" and evidence supporting a finding he was a Manpower employee.[5] As we shall subsequently explain, even assuming Riley was and believed himself to be a Manpower employee that fact does not negate a finding Riley was also a Southwest employee and therefore limited to a statutory workers' compensation remedy.

## II

As our Supreme Court explained in *Kowalski v. Shell Oil Co., supra,* 23 Cal.3d 168, 174: "The possibility of dual employment is well recognized in the case law. 'Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or "general" employer and a second, the "special" employer.' [Citation.]" (See also *Standard Oil Co.* v. *Anderson* (1909) 212 U.S. 215 [53 L.Ed. 480, 29 S.Ct. 252].)

---

tual, question." He argues *Santa Cruz Poultry* is inapplicable because it "involves review of a State Workers' Compensation program, *not* the Longshore and Harbor Workers' Compensation Act." Quoting *Baltimore & O. R. Co.* v. *Clark* (4th Cir. 1932) 59 F.2d 595, 597, Riley states federal law must be employed when interpreting the substantive provisions of the LHWCA; its uniform operation throughout the United States cannot "be deflected therefrom by local statutes or local views of common law rules." [Citations.] We agree with the general proposition stated in *Baltimore & O. R. Co.,* but do not agree with his conclusions regarding inapplicability of the *Doucet, Gaudet* and *Santa Cruz Poultry* cases.

First, we observe that to the extent Riley argues *Doucet* and *Gaudet* are not controlling because they "are based upon Fifth Circuit . . . law," there is no merit; Fifth Circuit law interpreting the LHWCA *is* federal LHWCA law. Second, our reading of *Doucet* and *Gaudet* reveals their holdings on this issue were not based on Louisiana rather than federal law. Third, nothing in the LHWCA negates the general rule that procedural matters (including the sufficiency of proof and presumptions and inferences) is governed by the law of the forum, i.e., here California. (See 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 63, pp. 92-93.) Fourth, the issue raised here involves a factual question (does a factual dispute exist or not?) not a legal question dependent on the interpretation of a particular jurisdiction's law.

Finally, we note there is a certain irony in Riley's argument here that federal law is controlling and precludes summary judgment here because he supports his argument by citing two California cases applying California law to California's workers' compensation statutes—*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d 486 and *Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d 168.

[5] Riley points to language in Manpower's proposal to Southwest Marine. Manpower, among other things, stated it was "willing to invest in innovative approaches in hiring, training and retention of people in order to insure a smooth running operation for SOUTHWEST MARINE." Manpower attached a copy of their "Guarantee" which Manpower explained "covers satisfactory performance, wage payments to employees, and, as employer, all contributions, deductions, deposits and taxes required by Federal, State and local laws." In the guaranty, Manpower stated, inter alia: "We guarantee to you upon the use of our services, . . . [t]hat our services will be performed to your satisfaction. With reasonable notification, Manpower will not charge for unsatisfactory performance."

██ The primary consideration in determining whether a special employment relationship exists ". . . is whether the special employer has ' "[t]he right to control and direct the activities of the alleged employee or the manner and method in which the work is performed, whether exercised or not . . . ." ' [Citation.]" (*Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at p. 175.) Factors relevant to determining whether an employee is the borrowed employee of another include: (1) whether the borrowing employer's control over the employee and the work he is performing extends beyond mere suggestion of details or cooperation; (2) whether the employee is performing the special employer's work; (3) whether there was an agreement, understanding, or meeting of the minds between the original and special employer; (4) whether the employee acquiesced in the new work situation; (5) whether the original employer terminated his relationship with the employee; (6) whether the special employer furnished the tools and place for performance; (7) whether the new employment was over a considerable length of time; (8) whether the borrowing employer had the right to fire the employee and (9) whether the borrowing employer had the obligation to pay the employee. (*Gaudet* v. *Exxon Corp., supra,* 562 F.2d 351, 355; *Ruiz* v. *Shell Oil Company* (5th Cir. 1969) 413 F.2d 310, 312-313.)

██ Circumstances which tend to negate the existence of a special employment relationship include the following factors: the worker is skilled and has substantial control over operational details, the worker is not engaged in the borrower's usual business, the worker works only for a brief period of time, does not use the tools or equipment of the borrowing employer but uses his own tools or the tools of the lending employer and the borrower employer neither pays the worker nor has the right to discharge him. (*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d at p. 492.)

██ Here, Riley's own deposition testimony establishes he specifically agreed to the Southwest Marine work assignment. He was an unskilled general laborer who was working exclusively at Southwest Marine's job site. Southwest Marine personnel trained Riley, provided his daily job instructions and supervised his work. Southwest Marine provided all safety equipment and work tools. Riley worked for Southwest more than briefly; he had been on the job for over seven months at the time of his injury. Riley believed Southwest Marine had the power to discharge him. In sum, Southwest Marine had the right to control and direct Riley's activities and the manner in which he performed the work; Southwest Marine did not merely make suggestions of details or cooperation.

These facts unequivocally establish, as a matter of law, that a special employment relationship existed between Riley and Southwest Marine. (Compare *Santa Cruz Poultry, Inc.* v. *Superior Court, supra,* 194

Cal.App.3d at p. 582, " '[W]here, as here, the alleged special employer was, by the admission of plaintiff, exercising direct supervision over the exact task during the accomplishment of which an employee is injured, the status of special employer must be found to exist as to a claim for that injury.' [Citation.]."") Thus, Riley's evidence he was Manpower's employee did not raise a material factual dispute; Riley was in a dual employment situation. At the time of his injury, Manpower was not Riley's sole employer; Riley also had a "special" employer, Southwest Marine. There was no material factual dispute here requiring the fact-weighing processes of a trial.

### III

As we noted previously, when a dual employment relationship exists, such that an employee has both a "general" and a "special" employer, the employee is generally limited to a statutory remedy for injuries he receives in the course of his employment with the special employer; he may not bring a separate tort action against the special employer.

Riley argues this general rule should be applied only when the general and special employers are involved in a joint business venture such as a construction project where the employee is lent by a subcontractor to another subcontractor or to the general contractor. (Compare, e.g., *Kowalski v. Shell Oil Co., supra,* 23 Cal.3d 168; *Industrial Ind. Exch.* v. *Ind. Acc. Com.* (1945) 26 Cal.2d 130 [156 P.2d 926]; *Employers' L.A. Corp.* v. *Indus. Acc. Com.* (1918) 179 Cal. 432 [177 P. 273].) He argues such a rule should not be extended to the labor brokerage situation. This argument is contrary to the weight of authority.

Extensive nationwide case law, interpreting both state workers' compensation statutes and the LHWCA, hold the "special employment" or "borrowed servant" doctrine applies to the labor brokerage situation and bars an employee who is injured while on assignment from a labor broker, such as Manpower, from bringing a tort suit against the assigned employer. (See, e.g., *Maynard* v. *Kenova Chemical Co.* (4th Cir. 1980) 626 F.2d 359 [Manpower employee, summary judgment affirmed]; *Alexander* v. *Chevron, U.S.A.* (5th Cir. 1986) 806 F.2d 526, cert. den. 483 U.S. 1005 [97 L.Ed.2d 735, 107 S.Ct. 3229] [LHWCA, "Champion" labor service employee, summary judgment affirmed]; *Beaver* v. *Jacuzzi Brothers, Inc.* (8th Cir. 1972) 454 F.2d 284 [Kelly Girl, Inc., employee, suit dismissed]; *St. Claire* v. *Minnesota Harbor Service, Inc.* (D.Minn. 1962) 211 F.Supp. 521 [Manpower employee, summary judgment granted]; *Terry* v. *Read Steel Products* (Ala. 1983) 430 So.2d 862 [Manpower employee, summary judgment affirmed]; *Santa Cruz Poultry, Inc.* v. *Superior Court, supra,* 194 Cal.App.3d 575, 583-584 [Manpower employee, summary judgment affirmed]; *Martin*

v. *Phillips Petroleum Co.* (1974) 42 Cal.App.3d 916 [117 Cal.Rptr. 269]; *Oxford* v. *Signal Oil & Gas Co.* (1970) 12 Cal.App.3d 403 [90 Cal.Rptr. 700] [summary judgment; oil industry labor supplier employee];[6] *Hamilton* v. *Shell Oil Company* (Fla.App. 1970) 233 So.2d 179, cert. den. 237 So.2d 762 [Manpower employee, summary judgment affirmed]; *Evans* v. *Abbott Products, Inc.* (1986) 150 Ill.App.3d 845 [502 N.E.2d 341] app. den. 114 Ill.2d 544 [508 N.E.2d 727] ["Personnel Pool of Cook County, Inc." employee, complaint dismissed]; *Fox* v. *Contract Beverage Packers, Inc.* (Ind.App. 1980) 398 N.E.2d 709 [Manpower employee, summary judgment affirmed]; *Renfroe* v. *Higgins Rack Coating & Manufacturing Co.* (1969) 17 Mich.App. 259 [169 N.W.2d 326] ["Employers' Temporary Service" employee, summary judgment affirmed]; *Danek* v. *Meldrum Mfg. & Engineering Co., Inc.* (1977) 312 Minn. 404 [252 N.W.2d 255] ["Labor Pool of St. Paul, Inc." employee, summary judgment affirmed]; *Wright* v. *Habco, Inc.* (Mo. 1967) 419 S.W.2d 34 [Manpower employee, summary judgment affirmed]; *Chickachop* v. *Manpower, Inc.* (1964) 84 N.J.Super. 129 [201 A.2d 90] [Manpower employee, summary judgment granted]; *Doboshinski* v. *Fuji Bank Ltd.* (1980) 78 App.Div.2d 537 [432 N.Y.S.2d 99] ["City-Wide Temporary Services, Inc." employee, denial of summary judgment reversed]; *Daniels* v. *MacGregor Company* (1964) 94 Ohio L.Abs. 306 [26 Ohio Ops.2d 196, 197 N.E.2d 427] affd. (1965) 2 Ohio St.2d 89 [31 Ohio Ops.2d 141, 206 N.E.2d 554] [Manpower employee, summary judgment entered]; *Robinson* v. *Omark Industries, Inc.* (1980) 46 Ore.App. 263 [611 P.2d 665] petn. dism. 291 Ore. 5 [627 P.2d 1263] ["Employers' Overload" employee]; see also *Word* v. *Motorola, Inc.* (1983) 135 Ariz. 517 [662 P.2d 1024] [discussing "lent servant" doctrine in context of temporary employment agency and summary judgment]; *Carr* v. *Carroll Co.* (Tex.App. 1982) 646 S.W.2d 561 [Manpower employee]; 1C Larson, Workmen's Compensation Law (1986) § 48.23, p. 8-476 and cases cited at fn. 65.)

By employing the borrowed servant doctrine in this case, the trial court did not "extend" a rule to a new situation, but rather applied a rule that is well-established.

---

[6] The Supreme Court in *Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at pages 177-178, footnote 9, while generally citing *Oxford* v. *Signal Oil & Gas Co., supra,* 12 Cal.App.3d 403 and *Martin* v. *Phillips Petroleum Co., supra,* 42 Cal.App.3d 916, with approval overruled these cases to the extent they held the power to terminate the special employment relationship and not the power to discharge an employee was what was important. The Supreme Court noted ". . . that an alleged special employer can have an employee removed from the job site does not necessarily indicate the existence of a special employment relationship. Anyone who has the employees of an independent contractor working on his premises could, if dissatisfied with an employee, have the employee removed. Yet, the ability to do so would not make the employees of the independent contractor the special employees of the party receiving the services." (*Ibid.*)

## IV

Riley argues sections 904(a) and 905(a) of the LHWCA nonetheless permit a tort recovery here.

These sections provide: "§ 904(a). Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title. In the case of an employer who is a subcontractor, only if such subcontractor fails to secure the payment of compensation shall the contractor be liable for and be required to secure the payment of compensation. *A subcontractor shall not be deemed to have failed to secure the payment of compensation if the contractor has provided insurance for such compensation for the benefit of the subcontractor.*

"§ 905(a). The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee . . . except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee . . . may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury was due to the contributory negligence of the employee. *For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 904 of this title.*" (Italics indicate language added by Congress in 1984.)

Riley asserts: "Under the L.H.W.C.A., specifically Section 905(a), a contractor can only become a special employer if the subcontractor fails to secure the payment of compensation as required by that Section." (Italics deleted.) Riley argues since the LHWCA coverage and compensation was provided by Manpower, Southwest Marine could not be a special employer entitled to LHWCA tort immunity. Riley's position rests not only on a misreading of the words of the LHWCA (i.e., reading "contractor" as synonymous with "special employer") but also on a premise the amendments were intended to abrogate the borrowed servant doctrine in the LHWCA except in the limited situation where the subcontractor employer has failed to secure payment of the compensation and the contractor has.

To support his position, Riley cites two cases from the Fifth Circuit Court of Appeals interpreting the 1984 amendments: *Frederick* v. *Mobil Oil Corp.* (5th Cir. 1985) 765 F.2d 442 and *Martin* v. *Ingalls Shipbuilding, Div. of Litton Sys.* (5th Cir. 1984) 746 F.2d 231. Riley's reliance on the 1984

amendments and these Fifth Circuit cases is misplaced. Not only do these cases fail to support Riley's position,[7] but the Fifth Circuit itself has unequivocally stated the 1984 amendments did not abolish the borrowed servant doctrine in the LHWCA context but were enacted to overrule the Supreme Court's decision in *Washington Metro. Transit Auth.* v. *Johnson* (1984) 467 U.S. 925 [81 L.Ed.2d 768, 104 S.Ct. 2827]. (*Capps* v. *N.L. Baroid-NL Industries, Inc.* (5th Cir. 1986) 784 F.2d 615, 618-619, cert. den. 479 U.S. 838 [93 L.Ed.2d 83, 107 S.Ct. 141]; *Doucet* v. *Gulf Oil Corp., supra,* 783 F.2d 518, 522; *West* v. *Kerr-McGee Corp.* (5th Cir. 1985) 765 F.2d 526, 530; see also *Garvin* v. *Alumax of South Carolina, Inc.* (4th Cir. 1986) 787 F.2d 910, 916, cert. den. 479 U.S. 914 [93 L.Ed.2d 288, 107 S.Ct. 314]; H.R. Conf. Rep. No. 98-1027, 98th Cong., 2d Sess., p. 24 (1984), reprinted in 1984 U.S. Code Cong. & Admin. News, at p. 2774; Note, *We Say What We Mean, and We Mean What We Say: The 1984 Amendments to Sections 904 and 905 of the LHWCA* (1985) 46 La.L.Rev. 361.)

In *Washington Metro. Transit Auth.* v. *Johnson, supra,* 467 U.S. 925, employees of a subcontractor on a construction project sued the general contractor for work-related injuries, mostly for respiratory injuries caused by the high levels of silica dust and other pollutants at the job sites. The issue before the Supreme Court was whether the general contractor which was not a borrowing or de facto employer qualified for tort immunity as an "employer" under sections 904(a) and 905(a) of the LHWCA solely because it had secured LHWCA compensation for its subcontractor's employees. ■ ■ ■ ■ The Supreme Court initially noted section 905(a)'s language did "not effortlessly embrace [general] contractors" since the section spoke "in terms of 'an employer' and, at least as far as the employees of subcontractors are concerned, a general contractor does not act as an employer," but the court concluded, based on Congress's use of the term "employer" in other sections of the LHWCA and *its* determination "granting tort immunity to [general] contractors that comply with [section 904](a) is consistent with the *quid pro quo*[8] underlying workers'

---

[7] In *Frederick* v. *Mobil Oil Corp., supra,* 765 F.2d 442, the court was faced with a situation where a contractor (Mobil Oil), who was not the injured employee's "actual employer" and who had not claimed to secure the payment of compensation for the subcontractor/employer's benefit, sought to come within the immunity of section 905(a). The court held "Mobil's naked allegation that it is a general contractor is clearly an insufficient basis upon which to afford it tort immunity under the Act." (*Id.* at p. 446.) There were no allegations in *Frederick* that Mobil had "borrowed" employee from the subcontractor at the time of the injury.

Similarly, in *Martin* v. *Ingalls Shipbuilding, Div. of Litton Sys., supra,* 746 F.2d 231, 232-233, the court held a contractor (actually, a subcontractor who had contracted with the plaintiff's employer) who was not the employee's employer and who had not secured compensation after the subcontractor had failed to do so (the subcontractor paid compensation to the injured employee), was entitled to immunity under section 905(a).

[8] "Workers' compensation statutes, such as the LHWCA, 'provide for compensation, in the stead of liability, for a class of employees.' S.Rep. No. 973, 69th Cong., 1st Sess., 16 (1926).

compensation statutes," that Congress intended to include general contractors within the term "employer" and to grant tort immunity to those contractors who secured LHWCA compensation on behalf of its subcontractor's employees. (*Id.* at p. 933, 936 [81 L.Ed.2d at pp. 776-779].)

In response to the *Washington Metro. Transit Auth.* decision, Congress quickly amended sections 904(a) and 905(a) to overrule the Supreme Court's decision which had made "[tort] immunity for general contractors . . . the rule rather than the exception." (*West* v. *Kerr-McGee Corp., supra,* 765 F.2d 526, 529.) In the House Committee Conference Report, the conferees explained the Supreme Court's decision did "not comport with the legislative intent of the Act nor its interpretation from 1927 through 1983" and "should not have any precedential effect." (H.R. Conf.Rep. No. 98-1027, 98th Cong., 2d Sess., p. 24 (1984), reprinted in 1984 U.S. Code Cong. & Admin. News at pp. 2771, 2774.)

As the Fifth Circuit stated in *West* v. *Kerr-McGee Corp., supra,* 765 F.2d 526, 530, "[t]he committee language shows that Congress intended to do no more than restore the understanding that existed [prior to the *Washington Metro. Transit Auth.* decision]." The Court explained before the *Washington Metro. Transit Auth.* decision, general contractors had made two arguments for LHWCA tort immunity from suits brought by subcontractor employees. The courts had accepted the general contractors' first argument that they were entitled to LHWCA tort immunity when the subcontractor employee was injured while he was a de facto, or borrowed, employee of the general contractor. The courts, however, had rejected a second argument made by general contractors: that a general contractor was entitled to immunity "not because the plaintiff was a 'borrowed' or *de facto* employee of the general contractor, but because of the general contractor's obligation under the pre-1984 LHWCA to guarantee the payment of compensation to subcontractors' employees." (*Id.* at p. 529.) The courts held "that general contractors' statutory duty under the LHWCA was 'secondary [and] guaranty-like,' and that immunity attached only in the event that a subcontractor failed to secure compensation and the general contractor was forced to pay it. [Citations.]" (*Ibid.*) This was the law Congress intended to reinstate when it enacted the 1984 amendments and overruled *Washington Metro. Transit Auth.* As the Fifth Circuit concluded: "Congress characterized [*Washington Metro. Transit Auth.*] as an unwanted deviation from 56 years

---

These statutes reflect a legislated compromise between the interests of employees and the concerns of employers. On both sides, there is a *quid pro quo.* In return for the guarantee of compensation, the employees surrender common-law remedies against their employers for work-related injuries. For the employer, the reward for securing compensation is immunity from employee tort suits." (*Washington Metro. Transit Auth.* v. *Johnson, supra,* 467 U.S. at p. 931 [81 L.Ed.2d at pp. 775-776].)

of precedent. That precedent includes the borrowed-employee doctrine." (*Id*. at p. 530.)

▮▮▮ Thus, as explained in *West v. Kerr-McGee Corp., supra,* 765 F.2d 526, the amendments Riley relies on addressed a different situation than the dual employment situation presented here; they address the tort liability of a general contractor under the LHWCA for injuries to a subcontractor's employee when the general contractor has *not* borrowed the subcontractor's employee.

Riley's position rests on linking tort immunity to securing the payment of LHWCA compensation. Such was essentially the position of the Supreme Court in *Washington Metro. Transit Auth. v. Johnson, supra,* 467 U.S. 925, which Congress rejected. By amending sections 904(a) and 905(a) Congress made it clear that LHWCA tort immunity was limited, as a rule, to the *employer* regardless of whether LHWCA coverage was directly paid by the employer or by another on the employer's behalf and extended to a nonemployer only in a limited situation involving contractors and subcontractors and subcontractor's default in securing LHWCA compensation for its employees. Here, Southwest Marine was Riley's employer; it was not a third party. Moreover, contrary to Riley assertion, Southwest Marine did secure LHWCA coverage for Riley by arranging to have Manpower make the insurance payments on its behalf. Sections 904(a) and 905(a) of the LHWCA do not support Riley's tort action here.

## V

▮▮▮ Riley argues it is "unconscionable" to apply the borrowed employee doctrine to preclude a tort suit in the labor brokerage situation since the assigned employer has already received the benefit of paying lower wages and benefits to the borrowed employees while the borrowed employee "gains absolutely nothing from this brokerage scheme; . . . to the contrary, he not only loses the wages and benefits paid to the regular company employees, but—if the 'special employer' is accorded insulation from tort liability—also loses the right to seek tort damages when the 'special employer' acts negligently thereby causing injury." Riley asserts a line of recent California cases[9] supports creating an exception to the general rule of tort

---

[9] Riley cites *Johns-Manville Products Corp. v. Superior Court* (1980) 27 Cal.3d 465 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758] [tort remedy allowed for employer's aggravating initial work-related injury by fraudulently concealing its condition and cause]; *Young v. Libbey-Owens Ford Co.* (1985) 168 Cal.App.3d 1037 [214 Cal.Rptr. 400] [tort action allowed for intentional infliction of emotional distress]; *Iverson v. Atlas Pacific Engineering* (1983) 143 Cal.App.3d 219 [191 Cal.Rptr. 696] [same, plus tort action allowed for physical assault pursuant to exception under Lab. Code, § 3601, subd. (a)(1)]; *McGee v. McNally* (1981) 119 Cal.App.3d 891 [174 Cal.Rptr. 253] [tort remedy allowed for intentional infliction of

immunity to cure these "inequities." We disagree. The cases he cites are distinguishable on their facts.[10]

The California Supreme Court recently explained: "The cases that have permitted recovery in tort for intentional misconduct causing disability have involved conduct of an employer having a 'questionable' relationship to the employment, an injury which did not occur while the employee was performing service incidental to the employment and which would not be viewed as a risk of the employment, or conduct where the employer or insurer stepped out of their proper roles. [Citations.]" *(Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 161 [233 Cal.Rptr. 308, 729 P.2d 743].)

As the Supreme Court explained, the cases on which Riley relies do not support creating an exception for the situation involved here—a negligently caused injury occurring in the scope of employment.

## VI

Riley argues general public policy supports allowing a tort suit against a special employer in a labor brokerage situation to remedy "inequities."

"The fundamental policy underlying the workers' compensation laws is that those hiring others to perform services should bear the risk of injuries incurred in the undertakings." *(State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 5, 13 [219 Cal.Rptr. 13, 706 P.2d 1146].) Before enactment of the workers' compensation statutes, there had been a sharp increase in industrial accidents due to the rise of the factory system and simultaneously a decrease in the employee's common law remedies (i.e., actions for negligence) by the harsh application the common law doctrines of contributory negligence, assumption of the risk and the negligence of fellow servants. (2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1988) § 1.01[2], p. 1-5; 1

emotional distress]; *Moreno* v. *Leslie's Pool Mart* (1980) 110 Cal.App.3d 179 [167 Cal.Rptr. 747, 9 A.L.R.4th 869] [strict liability action allowed against employer/chemical manufacturer and packager based on "dual capacity" doctrine]; *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833 [147 Cal.Rptr. 447] [tort remedy allowed for intentional infliction of emotional distress]; *Douglas* v. *E. & J. Gallo Winery* (1977) 69 Cal.App.3d 103 [137 Cal.Rptr. 797] [tort remedy allowed against employer/manufacturer based on "dual capacity" doctrine]; *Duprey* v. *Shane* (1952) 39 Cal.2d 781 [249 P.2d 8] [medical malpractice claim allowed against employer/doctor for negligent treatment of a job-related injury].

[10] We also note these cases are interpreting California's workers' compensation statutes, not the LHWCA. As Riley points out elsewhere, "the L.H.W.C.A. has uniform application across the United States and cannot be deflected by local statutes or local views of common law rules." (See *Baltimore & O. R. Co.* v. *Clark, supra,* 59 F.2d 595, 597.)

Herlick, Cal. Workers' Compensation Law (3d ed. 1987) § 1.1, p. 3.) Congress and state legislatures sought to remedy this situation by enacting workers' compensation to replace tort litigation. Enactment of the workers' compensation statutes represented a trade-off between the interests of employers and employees: "The employer accepted no-fault liability in exchange for a fixed and ascertainable liability. The worker gave up the possibility of tort damages for limited benefits payable without the need for litigation." (Cal. Workers' Compensation Practice (Cont. Ed. Bar 3d ed. 1985) § 1.7, pp. 5-6.) The workers' compensation system differed from tort law because it provided for: (1) liability without fault, (2) compulsory insurance, (3) automatic delivery of benefits, (4) limited benefits, and (5) expeditious machinery for resolving disputes. (*Id.* at § 1.3, p. 4.)

Riley's argument goes to the heart of the workers' compensation compromise, i.e., the trade-offs in replacing a tort remedy with a statutory compensation scheme. He asks us not to merely interpret the LHWCA or to determine its constitutionality but to remake the underlying compromise based on asserted public policy grounds. ■■ As a general rule, questions of public policy are for the legislative branch to determine; the courts may not declare public policy when the legislative branch has spoken on the subject. (See *Safeway Stores* v. *Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 574 [261 P.2d 721].) "[W]hether the Legislature has adopted what we might think to be the wisest and most suitable means of accomplishing its objects," is not the courts' concern. (*Lelande* v. *Lowery* (1945) 26 Cal.2d 224, 234 [157 P.2d 639].) As our Supreme Court explained over a hundred years ago: "Though the judiciary, like other departments of the Government, is bound to use its powers so as best to promote the public good and fulfil the will of the people, still we can know nothing of that will, except as it has found expression in the Constitution; nor can we, under pretext of promoting the public welfare, usurp powers with which the people have never invested us.

"The great object, with reference to which all the rules and maxims that govern the interpretation of statutes, Constitutions, and other written instruments have been framed, is to discern the true intent of their authors, and when that intent has been ascertained, it becomes the duty of the Court to give effect to it, whatever may be the convictions of the Judges as to its wisdom, expediency or policy." (*Bourland* v. *Hildreth* (1864) 26 Cal. 161, 180.)

■■ The expressed intent of the authors of the workers' compensation statutes is that the statutory remedy is the exclusive remedy against an employer for injuries occurring within the scope of the employment.

 The "equity" exception Riley seeks does not represent some narrowly drawn exception. He frames it in terms of an exception to be applied in the labor brokerage situation, but the underlying premise—that a tort remedy should be permitted because the employee has received lower pay and fewer benefits—cannot be limited to temporary employees. Logically, such an exception would also apply to other groups such as part-time or probationary employees who receive lower pay and fewer benefits, or, conceivably, to any employee who received lower wages and fewer benefits than the industry norm. Such an "equity exception" would significantly alter and contradict the intent of the workers' compensation statutory scheme.

Nor does there appear to exist any legislative support for Riley's proposed exception. The borrowed servant doctrine is neither new nor only recently applied to the labor brokerage situation. The fact the legislative branch has not sought to amend the workers' compensation statutes to permit a tort remedy for labor broker employees is a strong indication of approval for the judicial interpretation limiting such employees to the statutory remedy in such circumstances.[11]

## DISPOSITION

The judgment is affirmed.

Work, J., and Todd, J., concurred.

---

[11] In California, the Legislature, in the case of labor brokers in the nursing field, i.e., nurses' registries, has specifically provided that the registries are a nurse's "agent" rather than "employer." (See Bus. & Prof. Code, §§ 2732.05, 9958 et seq.; *Avchen* v. *Kiddoo* (1988) 200 Cal.App.3d 532 [246 Cal.Rptr. 152].)