[No. H007123. Sixth Dist. Jan. 11, 1991.]

THOMAS A. HOPPMANN, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, FIRST
BAPTIST CHURCH OF CUPERTINO et al., Respondents.

**1120**

COUNSEL

Howard M. Levin for Petitioner.

Gray & Prouty and Paul Ko for Respondents.

## Opinion

**CAPACCIOLI, Acting P. J.**—This is an employee's petition for writ of review. The Workers' Compensation Appeals Board (Board) reversed the workers' compensation judge (WCJ). The issue is whether a laborer who was injured falling off a church roof while working on a church renovation project for $5 an hour was properly excluded from compensation coverage as a recipient of "aid or sustenance only" (Lab. Code,[1] § 3352, subd. (b)), when he, a homeless indigent, was offered this work "for charitable reasons." The pertinent statute excludes from the definition of employee "[a]ny person performing services in return for aid or sustenance only, received from any religious, charitable, or relief organization." (§ 3352, subd. (b).)

### Record

The applicant and petitioner, Thomas A. Hoppmann, sustained multiple injuries when he fell off a roof while doing roofing work for the First Baptist Church of Cupertino (Church) on April 7, 1987. He had been performing services for Church which included roofing, gardening, digging, drywall work, painting, and laying a carpet, as well as assorted minor tasks such as sorting nuts and bolts. He was paid $5 an hour for his work. Some of the monies were taken from the deacons and missions' benevolent fund or assistance fund which was to be used for charitable purposes and some were taken from proceeds of a construction loan earmarked for church renovation purposes. Petitioner had worked for Church three to four weeks before he was injured for which work he was paid from $600 to $800 at $5 an hour.

Petitioner was indigent when he came to Church, looking for work; he had been referred from another Baptist church, which told him work was available at the Cupertino church. He gave Church a written resume when he applied. Pastor Southard told him there was work and he would be paid $5 an hour. Petitioner performed a substantial part of his services on the church renovation project involving restoration of a dilapidated house to serve as a parsonage; he worked alongside paid licensed contractors, unpaid church volunteers, and persons like himself paid $5 an hour.

Petitioner did not complete an employment application. No taxes were withheld from his monies and no Internal Revenue Service forms were sent out.

Pastor Southard testified that during the time petitioner performed his work for Church, it operated a charitable program for homeless or transient persons financed from the deacons and missions' benevolent fund. Some-

---

[1] All further statutory references are to the Labor Code.

times small payments were made to needy individuals; sometimes handouts were given; and when persons wished to maintain their dignity and asked to do work, something was found for them to do. Payment was "loosely" made at a $5 an hour rate. Most people worked only for an afternoon or a day. Petitioner, however, performed services as stated above, which were frequently, though not always, valuable to Church. The "not valuable" services included sorting of nuts, bolts, and plastic pieces.

When petitioner was admitted to Santa Clara Valley Medical Center after his injuries, he described himself as a "volunteer" for Church. At the time he was in great pain.

Although Church never considered petitioner an employee, the WCJ found an employment relationship. He said it may have been the intent of Church to provide services to the community by making employment available to needy persons, but that intention carries with it the legal obligations binding employer and employee where the services provided are those of laborers in the work force.

However, on reconsideration, Board reversed, finding the exclusion of section 3352, subdivision (b) applied. It gave these reasons: first, the terms "aid" and "sustenance" within the statute do not exclude money with which to buy necessaries of life; therefore the fact petitioner was paid cash wages does not prevent application of section 3352, subdivision (b). Next, private charities should not be discouraged from providing aid by requiring them to pay workers' compensation. "In fact, First Baptist has apparently discontinued its benevolence fund program due to the litigation and liability issues raised in this case . . . . It seems that [s]ection 3352, [subdivision] (b) was intended to prevent that unfortunate occurrence." Board concluded that petitioner was not an employee of Church and is not entitled to benefits.

## DISCUSSION

Because the facts are here undisputed, the issue whether petitioner is an employee covered by the compensation act is one of law. (*Johnson* v. *Workmen's Comp. Appeals Bd.* (1974) 41 Cal.App.3d 318, 320 [115 Cal.Rptr. 871].) The issue is whether a worker is excluded from coverage under section 3352, subdivision (b), when he performs services at an hourly rate for a private, nonprofit religious organization which believed that it provided him the work for charitable purposes, and characterized the payment as an "honorarium," but which received services of value in the marketplace which were also performed by persons of unquestioned employee status.

The pertinent statute excludes from employee status those who perform services for religious or charitable organizations "in return for aid or sustenance only." We agree with Board that the question whether the statute applies does not depend on whether the worker received cash payments or payment in kind such as meals or lodging. Board correctly states that the payments to petitioner are not necessarily wages just because they are in cash. (Cf. *Barragan* v. *Workers' Comp. Appeals Bd.* (1987) 195 Cal.App.3d 637, 650 [240 Cal.Rptr. 811] (*Barragan*).) But stating this principle does not solve the pertinent problem, which is to decide whether we have an employment relationship or a situation where an individual is given work for charitable reasons, solely so that he can sustain himself.

■ Where the traditional features of employment are present—consent of the parties, consideration for services rendered, and control of employer over employee—the presumption is employee status. (*Barragan, supra,* 195 Cal.App.3d 637, 643; *Parsons* v. *Workers' Comp. Appeals Bd.* (1981) 126 Cal.App.3d 629, 638 [179 Cal.Rptr. 88]; § 3357.) "The pertinent language in section 3352 is that any person who performs voluntary service for a nonprofit organization and receives no remuneration for the services other than meals, transportation, lodging or reimbursement for incidental expenses is not an employee." (*Barragan, supra,* 195 Cal.App.3d at p. 649, construing § 3352, subd. (i).) Voluntary service, for this purpose, means service gratuitously rendered with no expectation of payment other than incidental reimbursement. (*Ibid.*) The services must be charitably rendered. (*Ibid.*) Where services are provided with expectation of proportional compensation, then they are not voluntary and not within the statutory exception, even in a situation where the quid pro quo for the services is other than monetary. (*Id.* at pp. 649-650 [student extern provided services as part of requirement for obtaining degree].)

■ In this case we deal with a different subdivision of section 3352, subdivision (b), which does not use the language "voluntary services" but instead speaks of "services in return for aid or sustenance." However, the guiding principle is similar. The question under subdivision (i) in *Barragan, supra,* 195 Cal.App.3d 649 was whether to characterize the work as donated services, not within the scope of a traditional work-for-hire relationship, or as payment within a true employment relationship where services are provided, not out of charitable generosity, but for a living wage. ■ Under subdivision (b), similarly, the question is whether services are provided at a minimal level to obtain necessaries of life, or instead are part of a normal employment relationship.

The California Supreme Court in the so-called "workfare" case held that an indigent person required to work in order to receive general assistance is

entitled to workers' compensation benefits. (*County of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391 [179 Cal.Rptr. 214, 637 P.2d 681] (*County of Los Angeles*).) That case recognized that the code defines the term employee broadly and presumes that one who renders services to another is an employee. (*Id.* at p. 396, citing §§ 3351, 3357.) It further held that the worker who performed the same work as other employees and ran the same risks inherent in employment was a covered employee under the compensation scheme. (*Id.* at p. 399.)

In so deciding, the court overruled a Depression-era decision finding workfare participants were not employees. (*McBurney* v. *Industrial Acc. Com.* (1934) 220 Cal. 124 [30 P.2d 414] (*McBurney*).) The *County of Los Angeles* opinion said that *McBurney* had relied upon "an outmoded social philosophy under which workfare participants were treated as paupers or wards." (*County of Los Angeles, supra*, 30 Cal.3d at p. 399, fn. omitted.)

The plain underpinning of the holding in *County of Los Angeles* was that indigents forced to work at low-level jobs are covered employees rather than recipients of "charity." The court observed there are no substantive differences between such persons and other workers, and realistically speaking, such employees do not "donate" services but work for a living as best as they can, the same as other workers. The Supreme Court disparaged the attitude expressed in cases such as *McBurney, supra*, 220 Cal. 124 that "[t]he money and goods given to them were deemed to be not pay for their work, but an act of grace by the chosen, the nonidle. The work assigned to them was characterized as a 'form of charity'." (*County of Los Angeles, supra*, 30 Cal.3d at p. 400.) The *County of Los Angeles* case quoted from another decision that " '[i]t seems to this court more in harmony with the spirit of work-relief legislation to hold the claimant to be an employee than to hold him to be a pauper or ward. A sound public policy prompts the efforts of the state to preserve the self-reliance of its citizens, even if at extra expense . . . . The state recognizes that many of its citizens are indigent, but it still wishes them to be independent. The relief legislation was enacted with that purpose in view . . . . The evolution of public welfare has been from public "charity" toward social justice. Courts should facilitate such development by an enlightened and liberal interpretation of all welfare laws'. [Citations.]" (*Id.* at p. 401, quoting from *Industrial Commission of Ohio* v. *McWhorter* (1934) 129 Ohio St. 40 [1 Ohio Ops. 353, 193 N.E. 620, 622-623, 96 A.L.R. 1150].)

The decision also noted that "[t]here is no sound reason for discriminating against a poor relief worker who may be injured while working shoulder to shoulder with a regular county employee who would be entitled to

benefits . . . ." (30 Cal.3d at p. 402, quoting from *Scissons* v. *City of Rapid City* (S.D.1977) 251 N.W.2d 681, 687.)

Here, as in the *County of Los Angeles, supra,* 30 Cal.3d 391, the claimant worked shoulder to shoulder with covered employees, did the same work, received wages, and ran the same risks. Both *Barragan, supra,* 195 Cal.App.3d. 649 and *County of Los Angeles* make plain that services are not voluntary because the worker is poor and must work, or receives less than others may be able to obtain. The same must be true here. Petitioner is not a voluntary worker nor one who works for necessities alone. Here, as in *County of Los Angeles* and in *Barragan,* employment is the more accurate characterization of the parties' relationship. Petitioner worked to provide for his necessities of life the same as do most workers; but he was not acting as a voluntary donator of services any more than was the workfare recipient in *County of Los Angeles* or the student extern in *Barragan,* nor was he working for monies measured by his strict needs. He worked at a set hourly rate, for cash wages. These wages were not calculated to be the equivalent of his necessaries of life; they were not provided in lieu of meals and lodging. They were hourly wages, indistinguishable in any way from the wages paid to any laborer, except that they were probably considerably below the prevailing wage rate for the kind of work done. They were not aid and sustenance; they were wages.

Church argues that petitioner's situation differs from that of the workfare recipient because the employer here is a church, whereas there it was a public agency. The statute, however, makes no express distinctions on that basis. Subdivision (b) exempts only persons providing services to religious, charitable, or relief organizations, "in return for aid or sustenance only," while subdivision (i) exempts "voluntary service" for either a public agency or a private, nonprofit organization, where the remuneration is meals, transportation, lodging, or reimbursement for incidentals. These provisions exhibit no scheme to exempt nonprofit private or religious organizations per se; rather, if there is any overall purpose here, it appears to be exemption of services which are outside normal employment relationships, either because they are not compensated at the prevailing rate or because the motive in providing these services is primarily donative rather than mercenary. The critical test in all cases is whether services are rendered (1) for charitable reasons, (2) for aid and sustenance or, (3) for wages.

In arguing that church workers should be treated differently from workfare recipients, Church makes the point that charities, unlike public agencies, may be deterred from providing work for the needy if such recipients are treated as covered workers. Church expresses the same position found in Board's decision that providing coverage will deter charitable

organizations from hiring the needy. In support of this argument Church points to language in the *County of Los Angeles* case saying that in the case of a county, unlike that of a private charity, there cannot be any such chilling effect because the county is obligated to pay aid.

The *County of Los Angeles* decision observes that the county has a duty to provide support while a private charity does not, and therefore the county cannot be discouraged from paying aid by being forced to pay compensation benefits. (*County of Los Angeles, supra*, 30 Cal.3d at p. 405.) However the decision does not say that this difference is a basis for providing different tests of coverage for public and private employees. The above referenced language of the decision states a practical reason supporting the result there, and supports the court's holding that section 3352, subdivision (b) does not apply to public agencies. However, this language constitutes a single sentence in an opinion of 13 pages which is otherwise devoted to explaining that a workfare recipient is factually in an identical relationship with his employer as any other employee and is therefore a covered worker. Nothing in the decision says that the way to apply the statute is to decide whether a "chilling effect" would occur if coverage were found. If that were the proper analytic route to determine if compensation coverage exists, a good number of employers would be excluded from the scheme. We conclude the question of the existence of an employment relationship depends on the factual nature of the relationship and not on the public or private status of the employer or on any considerations of deterrence, which considerations, we suggest, would be extremely difficult to prove.

The issue here, not directly addressed in *County of Los Angeles, supra*, 30 Cal.3d 391, is whether work for a church at a low rate of pay is work for aid and sustenance only. Where the pay is above the minimum wage and is not gauged by the recipient's necessities, we believe that it can logically only be wages. This result comports with the principle we have extracted from the decisions in *County of Los Angeles* and *Barragan, supra*, 195 Cal.App.3d 649 that persons doing work normally done by paid workers, for wages not merely nominal, are members of the work force and are covered by the compensation act.

Church contended that because claimant referred to himself as a church volunteer while lying in pain awaiting medical attention he must be considered a volunteer. Even assuming that claimant had any notion of the difference between being an employee and a volunteer, and that he was clearheaded and able to think about these matters at the time, it would make no difference what he said nor what Church believed, because the reality of the situation, not the parties' characterization of the relationship,

controls the outcome. (See *Truesdale* v. *Workers' Comp. Appeals Bd.* (1987) 190 Cal.App.3d 608, 617 [235 Cal.Rptr. 754].)

The attorney for Church argued here that petitioner "bit the hand that fed him" and that he is responsible for the discontinuance of Church's charitable work program. One is tempted to observe that the hand that fed him did not go empty; Church got some 160 hours of work at $5 an hour in return for its alleged charity to petitioner. And as petitioner's attorney points out, the cost to Church of providing compensation insurance for an annual payroll of $5,000 would have been $553 in 1987 when petitioner was hired. If that cost sufficed to discourage Church's "charity," Church was easily discouraged. But whether or not charity is easily discouraged, the law confers employee status under the compensation act when an employment relationship in fact exists, and an employer cannot escape the obligations of such a relationship by characterizing his hiring of an employee as "charitable," by failing to report it to the Internal Revenue Service, or by paying below-scale wages. Where, as here, the normal incidents of an employment relationship are present, the concomitant legal obligations follow. We hold that there is coverage.

### DISPOSITION

For all of the above reasons, the Workers' Compensation Appeals Board's opinion and decision after reconsideration are annulled, and the matter is remanded for further proceedings consistent with this opinion.

Cottle, J., and Elia, J., concurred.