[No. H015775. Sixth Dist. Aug. 20, 1998.]

ANGELA BRASSINGA et al., Plaintiffs and Appellants, v.
CITY OF MOUNTAIN VIEW et al., Defendants and Appellants;
GREG ACTION, Defendant and Respondent.

**COUNSEL**

Ruby & Schofield, Allen Ruby and Glen Schofield for Plaintiffs and Appellants.

Robinson & Wood, Thomas R. Fellows, Christian B. Nielsen and Rebecca L. Moon for Defendants and Appellants.

Hoge, Fenton, Jones & Appel and H.R. Lloyd, Jr., as Amici Curiae.

## OPINION

**MIHARA, J.**—The Mountain View, Palo Alto and Los Altos Police Departments each had a special weapons and tactics (SWAT) team. In order to ensure an adequate response to "incidents," the three departments cooperated to form the "North County Regional" SWAT team (hereafter the Regional Team) which was composed of all three departments' SWAT teams. The Regional Team trained together and responded to incidents as a single team, although the members of the Regional Team remained employed by their individual departments.

Regional Team training exercises often utilized the services of "role players." During a Regional Team training exercise, Theodore Brassinga, a Palo Alto reserve police officer who was not a SWAT team member but was assigned to serve as a role player, was shot to death by Greg Acton, a Mountain View police officer who was a Regional Team member. Plaintiffs, Brassinga's heirs, filed a wrongful death action against Mountain View and Acton. Mountain View asserted as an affirmative defense that workers' compensation benefits were the exclusive remedy because either Mountain View was Brassinga's "special employer" at the time of his death or the Regional Team was the "special employer" of both officers. Acton's motion for summary adjudication was granted, but Mountain View's summary judgment motion was denied. The case was tried before a jury, but the trial court granted plaintiffs' motion for a directed verdict on liability in respondeat superior. The only issue put before the jury was the level of damages. It returned a $3,250,000 verdict for plaintiffs. Mountain View claims on appeal that the superior court erred in denying summary judgment and the trial court erred in directing the verdict because either there was a legitimate factual question that should have been put before the jury or the evidence indisputably established the affirmative defense. Plaintiffs' cross-appeal challenges the summary adjudication in favor of Acton. We conclude that the superior court erred in granting Acton's motion and the trial court erred in directing the verdict. Therefore, we reverse the judgment.

### THE PLEADINGS

Plaintiffs' complaint alleged that Acton had been negligent and that Mountain View was liable by way of respondeat superior for Acton's

negligent acts. It also alleged that Mountain View had been directly negligent in "the hiring, retention, training and supervision of Acton, the inspection of Acton's weapon, and the failure to establish procedures" to prevent accidental shootings. Mountain View pled as an affirmative defense that Brassinga was Acton's "co-worker" and Mountain View's "employee" at the time of his death and therefore his exclusive remedy was provided by the Workers' Compensation Act.

### SUMMARY JUDGMENT MOTION

Mountain View and Acton moved for summary judgment or summary adjudication. They argued that workers' compensation was the exclusive remedy because Brassinga was a "special employee" of either the Regional Team or Mountain View. The affidavits submitted by Mountain View and Acton in favor of their summary judgment motion established the following facts.

The Regional Team regularly trained together and responded to incidents as a single team although the members of the Regional Team remained employed by and were paid by their individual departments. The Regional Team itself had no employees. The equipment used by the Regional Team was purchased by and stored at the individual departments. The departments attempted to complement each other by not duplicating equipment.

On May 15, 1994, the Regional Team held a training exercise at the Gilroy train yard. Brassinga was employed by Palo Alto as a reserve police officer and paid for his services. Palo Alto paid Brassinga on May 15 for "helping the regional team" during its day-long training exercise. He was assigned to act as a "role player" during the training exercise.[1] Brassinga had served in the same capacity at a previous Regional Team training exercise. Role players were brought to the May 15 training exercise by both Palo Alto and Mountain View. Mountain View brought four Mountain View employees who were not members of the SWAT team to act as role players.

At the beginning of the training session, a weapons inspection was conducted by "range masters" who had been "trained to insure that the weapon is empty." Early in the training session, the Regional Team split into two groups. One group was composed of the Palo Alto members while the other was composed of the Mountain View and Los Altos members. The plan was for these two groups to train separately and then "blend together" and train as a group. The role players, including Brassinga, were initially

---

[1] Palo Alto reserve police officers may refuse an assignment without discipline, but Brassinga did not decline this assignment.

utilized in the Palo Alto group's training. When the Palo Alto group took a break, Mountain View Police Officer David Worley, who was supervising the Mountain View/Los Altos group's training, asked Brassinga and the other role players "if they minded coming on over, instead of taking a break" and acting as role players in the Mountain View/Los Altos group's training. Brassinga and the other role players agreed to do so.

These role players included the four Mountain View employees, Brassinga and a second Palo Alto reserve police officer. Worley gave the role players five to ten minutes of instructions about what they should do. He continued to give them instructions as the training progressed. Two or more Amtrak employees[2] requested permission to join the role players. Worley allowed them to participate. Regional Team members from Palo Alto and Mountain View were also acting as role players at times for the Mountain View/Los Altos group. Worley had the power to discipline any of the role players by removing them from their role playing duties. If any of the role players had decided that they no longer wished to participate, they could have discontinued their participation without criticism or discipline.

While he was carrying out his role playing duties, Brassinga was sometimes supervised by Palo Alto officers and at other times supervised by a Mountain View officer. Brassinga's role playing included the use of a "toy gun" which had been provided to him by Palo Alto. While acting as a role player in the training of the Mountain View/Los Altos group, Brassinga was shot to death by Acton. Plaintiffs received workers' compensation death benefits from Palo Alto.

### RULING ON SUMMARY JUDGMENT MOTION

Judge Jeremy D. Fogel denied Mountain View's motion for summary judgment. However, he granted Acton's motion for summary adjudication on the ground that "as a matter of law based upon the undisputed evidence" Acton and Brassinga "were general employees of their respective police agencies and special employees of the Regional SWAT Team, a joint enterprise among the cities of Los Altos, Mountain View and Palo Alto." Fogel ·concluded that, because Brassinga and Acton "were in effect co-employees of the same joint enterprise, plaintiffs cannot recover against Acton directly unless Acton's conduct comes within one of the exceptions contained in Labor Code section 3601(a), in which event respondeat superior liability against City would be barred by Labor Code section 3601(b)." Nevertheless, Fogel found that "Acton's immunity does not extend to City . . . ." He stated "somebody has got to be responsible if there is tort conduct committed by Officer Acton."

---

[2]The training session was taking place at a Caltrain facility run by Amtrak.

## TRIAL

Judge Richard C. Turrone was the trial judge. He denied Mountain View's request that the court bifurcate the affirmative defense and try it before the rest of the issues in the case. Mountain View conceded that Acton had been negligent. It moved for judgment on the pleadings on the ground that it was immune from liability under Government Code sections 815 and 815.2. This motion was denied. Judge Turrone ruled that Judge Fogel's finding that Acton and Brassinga were special employees of the Regional Team was not binding on him.

## TRIAL EVIDENCE

The Regional Team was formed because the individual departments lacked adequate resources and personnel to handle emergencies. The Regional Team had about 27 members. It had a single standard for membership and a "unified chain of command." This meant that a Regional Team member from one department could supervise Regional Team members from another department. The Regional Team did not pay the salary of any of its members, owned no property and had no office. It trained in four week-long sessions each year. Although all of the equipment used by the Regional Team was owned by and stored at individual departments, the departments attempted to complement each other by not duplicating equipment and having interchangeable equipment. The team members "interchanged equipment all the time . . . ." The members of the Regional Team wore identical "team SWAT uniforms." These uniforms were worn only for Regional Team activities.

The Regional Team regularly used "role players" in its training. The role players were either members of the Regional Team or other "law enforcement agency" people. Usually, the role players were police department employees. These role players could be supervised by any member of the Regional Team. The Regional Team commanders were in command of the role players "regardless [of whether the role player] was a Palo Alto employee, a Mountain View employee or a Los Altos employee."

On May 15, 1994, the Regional Team met for what was planned to be a day-long training exercise at the Gilroy Caltrain yard. The intent was for the Regional Team members from all three departments to work together. In order to simulate actual situations, the training exercise was planned to include role players, and Palo Alto and Mountain View had brought police

department employees to act as role players.[3] Brassinga was a Palo Alto reserve police officer. He was not a member of the Regional Team or the Palo Alto SWAT team. Brassinga was assigned to act as one of the role players to assist the Regional Team in this training exercise. He had acted as a role player during a previous Regional Team training exercise. Brassinga was paid $7.40 per hour for his services.

Acton was employed by Mountain View, and he was a member of its SWAT team and the Regional Team. He became a "range master" in 1994. Acton had been asked to become a range master because the range masters on the Regional Team were predominantly from Palo Alto, and Mountain View wanted to "take a little bit of the burden off of them." A range master "is someone who controls the overall supervision of weapons and training." Mountain View did not have a weapons inspection policy which set forth how a weapons inspection was to be done. On May 15, the weapons inspection was done simultaneously for the entire Regional Team. All of the team members lined up at once. The Mountain View officers' weapons were checked by Mountain View range masters while other individuals checked the weapons of the Los Altos and Palo Alto officers. Acton and another Mountain View officer were the range masters who inspected the weapons of the Mountain View officers. Like his fellow officer, Acton intended to have each of the officers whose weapons he inspected inspect his weapon. However, unlike his fellow officer, he neglected to have *anyone* inspect his weapon. Thus, prior to the shooting of Brassinga, no one discovered that Acton had never unloaded his weapon. Acton felt that one of the "factors" contributing to his failure to inspect his weapon or have his weapon inspected was that another Mountain View officer was hurrying the weapons inspection along.

A Regional Team member from Palo Alto explained to Brassinga and the other Palo Alto reserve officer what the two men would be doing as role players. After the weapons inspection, the entire Regional Team went on an extensive tour of the trains on which they would be training. Brassinga and the other Palo Alto reserve police officer accompanied the Regional Team members on this tour. Then, the Regional Team split into two equal groups. One group was made up of the Palo Alto members and the other group was made up of the Mountain View and Los Altos members. The two groups began training in different train cars. Brassinga and the other role players worked with the Palo Alto group for about an hour. The role players were wearing "civilian clothes."

When the Palo Alto group took a break, Mountain View Police Sergeant David Worley asked the role players to assist the Mountain View/Los Altos

---

[3] These role players were later supplemented by some Amtrak employees who "apparently volunteered" to act as role players.

group with its training.[4] Worley was the Regional Team's assistant tactical commander, and he was in command of the Mountain View/Los Altos group's training exercises. The group of role players included Brassinga, the other Palo Alto reserve police officer, four Mountain View Police Department employees and several members of the Regional Team command staff. The role players agreed to assist the Mountain View/Los Altos group in its training. These role players were joined by two Amtrak employees who "volunteered" to act as role players in the exercise. Brassinga could have discontinued his role playing duties at any time without discipline or criticism. Any Regional Team member could have complained about Brassinga's conduct in performing his role playing duties and caused Brassinga to be disciplined by directing a complaint through the "chain of command" back to Palo Alto. A Regional Team member could also have removed Brassinga from his role playing duties as discipline for inappropriate conduct.

Throughout his role playing duties, Brassinga was given instructions on how he should act. While Brassinga and the other role players were role playing with the Mountain View/Los Altos group, they were "subject to the command" of Worley, and Worley gave them instructions on how to fulfill their role playing duties. He would explain the scenario to the role players and tell them how much of a challenge to provide and what type of behavior to engage in, but he would allow the role players to decide among themselves who would play which role and where to conceal themselves. Worley talked to the role players after each scenario and gave them instructions. The role players provided the same services to the Mountain View/Los Altos group that they had provided to the Palo Alto group.

In the course of one of the scenarios conducted by the Mountain View/Los Altos group, about halfway through the day's training exercises, Acton shot Brassinga. At that point, it was discovered that Acton's weapon was fully loaded.

### MOTIONS FOR NONSUIT AND DIRECTED VERDICT

After both sides had rested, plaintiffs moved for nonsuit on Mountain View's affirmative defense. Mountain View opposed plaintiffs' motion and made its own motion for a directed verdict. Each side argued that it had established its case as a matter of law. However, Mountain View also argued, in opposition to plaintiffs' motion, that the issue of whether Brassinga was a special employee "needs to go before the jury." Judge Turrone found that "the facts in this case, in large part, are not in dispute." "It's

---

[4]There was also testimony that it was not Worley who asked them to work with the Mountain View/Los Altos group but a Palo Alto team member who made this request.

uncontradicted [Acton's] an employee of Mountain View. He's working on his job as a Mountain View police officer, paid by Mountain View. [¶] At the time of the shooting it's conceded that his chain of command, that is to say his supervisors, were Mountain View officers . . . . And that he was never under the command of Palo Alto. [¶] . . . [Brassinga's] a reserve officer of Palo Alto. I think it's significant that he's not a member of the regional team . . . . And I think significantly he was a volunteer to be a role model [sic] for Palo Alto as well as later Mountain View when they needed a role player." "The role players, without exception, were, as I understand it, volunteers . . . . I think that's significant. I mean, is one to argue that the Amtrack [sic] volunteers were special employees of the City of Mountain View? I have some trouble with that." "[T]he Palo Alto reserve officers were doing the same thing they had done for Palo Alto. No one ever counter-manded, 'Forget everything that Palo Alto told you; you are now subject to our rulings.' " "And significantly everything that transpired that day, except for that latter portion of Mountain View's training with role players, was done separate and distinct." "This regional team had no office, no payroll, no equipment of its own." "Each member of the team and the victim was not a member of the team, but each member of the team was paid by the respective police agencies. The equipment that [Brassinga] was using be-longed to Palo Alto . . . ." "The evidence is just not there that [Brassinga] . . . ever consented to a new employment relationship." "Mountain View's right to control the details of what [Brassinga] did were minimal at best."

Judge Turrone granted plaintiffs' motion for nonsuit on Mountain View's affirmative defense and denied Mountain View's motion for a directed verdict. He directed a verdict "on negligence in respondeat superior" in favor of plaintiffs. "This case is uncontradicted Acton was negligent, he was working for the city. They are responsible. There's no immunity." The case went to the jury solely on damages, and the jury returned a verdict in the amount of $3,250,000 for plaintiffs. Judgment was entered on the jury's verdict. Mountain View's motions to vacate the judgment, for a new trial and for judgment notwithstanding the verdict were denied. Mountain View filed a timely notice of appeal. Plaintiffs filed a timely notice of cross-appeal challenging the summary adjudication of its action against Acton.

## DISCUSSION

The only defense litigated by Mountain View was its affirmative defense based on the exclusive remedy provisions of the Workers' Compensation Act. "[T]he right to recover [workers'] compensation is [with certain excep-tions not applicable here] . . . the sole and exclusive remedy of the em-ployee or his or her dependents against the employer . . . ." (Lab. Code,

§ 3602, subd. (a).) "[Workers' compensation is, with certain exceptions,] the exclusive remedy for injury or death of an employee against any other employee of the employer acting within the scope of his or her employment . . . ." (Lab. Code, § 3601, subd. (a).) "In no event . . . shall the employer be held liable, directly or indirectly, for damages awarded against, or for a liability incurred by the other employee . . . ." (Lab. Code, § 3601, subd. (b).)

It was undisputed that Palo Alto was Brassinga's general employer, but this fact did not preclude a finding that Mountain View or the Regional Team was Brassinga's special employer. ▉ " 'Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or "general" employer and a second, the "special" employer.' . . . [¶] If general and special employment exist, 'the injured workman can look to both employers for [worker's] compensation benefits. [Citations.] If work[er]'s compensation is available, it constitutes, with an exception not pertinent here, the work[er]'s sole remedy against the employer. [Citation.] Thus where there is dual employment the work[er] is barred from maintaining an action for damages against either employer.' " (*Kowalski* v. *Shell Oil Co.* (1979) 23 Cal.3d 168, 174-175 [151 Cal.Rptr. 671, 588 P.2d 811], fn. omitted.) The basic issues presented in this appeal and the cross-appeal are: (1) did the evidence establish as a matter of law that *either* Mountain View or the Regional Team *was* Brassinga's special employer; and (2) did the evidence establish as a matter of law that *neither* Mountain View *nor* the Regional Team was Brassinga's special employer.

### A. *Standards of Review*

Mountain View argues that this case presents "the problem of conflicting and mutually irreconcilable standards of review with respect to the same evidence, the same facts, the same issue and the same causes of action, arising out of the different procedural contexts in which the trial court's rulings took place." We do not find the applicable standards of review to be problematic, conflicting or irreconcilable. The challenged rulings are all reviewed de novo, and the relevant standards require reversal of the denial of summary judgment if Mountain View established its defense as a matter of law, reversal of the directed verdict if there was sufficient evidence to support Mountain View's exclusive remedy defense, and reversal of the summary adjudication if there was a material triable factual issue as to Acton's exclusive remedy defense. These standards do not conflict.

## 1. *Summary Judgment Motion*

■ Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071 [258 Cal.Rptr. 721]; *Barisich* v. *Lewis* (1990) 226 Cal.App.3d 12, 15 [275 Cal.Rptr. 331].) ■ "The question of whether an employment relationship exists ' "is generally a question reserved for the trier of fact." ' . . . This remains true '[w]here the evidence, though not in conflict, permits conflicting inferences.' . . . However, if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists becomes a question of law which may be resolved by summary judgment. . . ." (*Riley* v. *Southwest Marine, Inc.* (1988) 203 Cal.App.3d 1242, 1248-1249 [250 Cal.Rptr. 718], citations omitted.) ■ "[S]pecial employment is most often resolved on the basis of *'reasonable inferences* to be drawn from the circumstances shown.' Where the evidence, though not in conflict, permits conflicting inferences, ' ". . . the existence or nonexistence of the special employment relationship barring the injured employee's action at law is generally a question reserved for the trier of fact." ' " (*Marsh* v. *Tilley Steel Co.* (1980) 26 Cal.3d 486, 493 [162 Cal.Rptr. 320, 606 P.2d 355], first italics added.)

## 2. *Directed Verdict*

■ A directed verdict is also subjected to de novo appellate review.[5] ■ "[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit." (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].) "A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom.' " (*Id.* at pp. 400-401.) If substantial evidence before the jury could have supported a finding that Mountain View had established its exclusive remedy defense, the trial court erred in granting a directed verdict. On the other hand, if the record lacked substantial evidence supporting this defense, the directed verdict was proper. (Cf. *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].)

## B. *Regional Team Could Not Qualify as an "Employer"*

■ Mountain View argues that the Regional Team was the special employer of both Brassinga and Acton. Plaintiffs maintain that the Regional

---

[5]"[A]ny party may, without waiving his or her right to trial by jury in the event the motion is not granted, move for an order directing entry of a verdict in its favor." (Code Civ. Proc., § 630, subd. (a).)

Team was not an entity which could qualify as an "employer" under the Workers' Compensation Act. Plaintiffs' claim is correct.

The Labor Code states that, for workers' compensation purposes, " 'employer' means: [¶] (a) The State and every State agency. [¶] (b) Each county, city, district, and *all public and quasi public corporations and public agencies therein.* [¶] (c) Every person including any public service corporation, which has any natural person in service. [¶] (d) The legal representative of any deceased employer." (Lab. Code, § 3300, italics added.)

Mountain View concedes that the Regional Team was not a "joint powers agency" with independent existence, but it characterizes the Regional Team as a " 'joint enterprise' arising out of a 'mutual aid agreement' of the type authorized by Gov. C. §§ 8616-8617." It describes a "joint enterprise" as an informal undertaking in which the "associates" share control. Government Code sections 8616 and 8617 do not authorize the creation of a public agency.[6] Instead, these statutes permit public agencies to cooperate. In contrast, Government Code sections 6506 and 6507 do authorize public agencies to create a public agency or entity to administer a joint powers agreement.[7] As it is conceded that there was no joint powers agreement in this case, none of these Government Code sections are applicable.

Mountain View places undue reliance on the decision of an intermediate appellate court in Michigan. That decision, *Berger* v. *Mead* (1983) 127 Mich.App. 209 [338 N.W.2d 919], is of little help on this subject, because it does not consider whether a "joint enterprise" comes within California's definition of an "employer" for worker's compensation purposes.[8] (*Berger, supra,* at p. 923.) We can also find no support in *Horney* v. *Guy F. Atkinson*

---

[6]"During any state of war emergency or state of emergency when the need arises for outside aid in any county, city and county, or city, such aid shall be rendered in accordance with approved emergency plans. [¶] It shall be the duty of public officials to cooperate to the fullest possible extent in carrying out such plans." (Gov. Code, § 8616.) "In periods other than a state of war emergency, a state of emergency, or a local emergency, state agencies and political subdivisions have authority to exercise mutual aid powers in accordance with the Master Mutual Aid Agreement and local ordinances, resolutions, agreements, or plans therefor." (Gov. Code, § 8617.)

[7]"The agency or entity provided by the agreement to administer or execute the agreement may be one or more of the parties to the agreement or a commission or board constituted pursuant to the agreement or a person, firm or corporation, including a nonprofit corporation, designated in the agreement. One or more of the parties may agree to provide all or a portion of the services to the other parties in the manner provided in the agreement. The parties may provide for the mutual exchange of services without payment of any consideration other than such services." (Gov. Code, § 6506.) "For the purposes of this article, the agency is a public entity separate from the parties to the agreement." (Gov. Code, § 6507.)

[8]*Berger* simply does not address the dispositive issue before us. The plaintiff in *Berger* worked for one city's police department. The defendants worked for police departments in

*Co.* (1983) 140 Cal.App.3d 923 [190 Cal.Rptr. 18] for Mountain View's claim that the Regional Team was an employer. In *Horney*, it was undisputed the injured employee was a *general* employee of *the joint venture. (Horney, supra,* at p. 925.) *Horney* did not consider the question of what type of entity qualifies as an employer. The joint venture in that case was the prime contractor on a construction project, and it maintained its own bank account from which it paid *its* employees. (*Horney, supra,* at pp. 925-926.) The only proposition for which *Horney* stands which is relevant to this case is that "[a]n employee of a joint venture is an employee of each individual member of the joint venture [and therefore] . . . a member of a joint venture is entitled to the protection of the exclusive remedy provisions of the Labor Code." (*Horney, supra,* at p. 927.) If Mountain View had established that the Regional Team was an employer which employed Brassinga, *Horney* might support its exclusive remedy defense. However, *Horney* tells us nothing about whether the Regional Team could qualify as an "employer" under Labor Code section 3300.

Another potentially relevant case is *Rogness* v. *English Moss Joint Venturers* (1987) 194 Cal.App.3d 190 [239 Cal.Rptr. 387]. In *Rogness*, the plaintiffs were general employees of one member of a joint venture. They were injured while working on a construction project in which the joint venture was engaged. They sued the joint venture and each of the joint venturers. (*Rogness, supra,* at pp. 191-192.) The appellate court distinguished *Horney* and held that the joint venture and the joint venturers other than the plaintiffs' employer had no exclusive remedy defense. It held that ". . . an employee of one party in a joint venture is not as a matter of law also an employee of the joint venture itself or the other joint venturers and therefore is not limited to his workers' compensation remedy under the Labor Code in seeking recovery from the remaining joint venturers for alleged negligence." (*Rogness, supra,* at p. 191.) Like *Horney, Rogness* did not consider whether

---

other cities. (*Berger* v. *Mead, supra,* 338 N.W.2d at p. 922, fn. 3.) All of the officers were members of the "South Oakland Tactical Support Unit." The plaintiff was shot during a training exercise held by the unit. (*Berger, supra,* at p. 922.) He brought a civil action against the defendants. Defendants sought summary judgment based on workers' compensation exclusivity. They claimed that the unit was a "joint venture" of the various cities and the plaintiff and the defendants were coemployees of the unit. (*Ibid.*) The trial court granted summary judgment.

The court of appeal, after noting that it was a question of law whether the unit was a "noncommercial joint venture" or "joint enterprise," determined that the unit was a joint enterprise of the cities. (*Berger* v. *Mead, supra,* 338 N.W.2d at pp. 922, 923.) It proceeded directly to the question of whether the undisputed facts established that the unit was the special employer of the plaintiff and the defendants. Concluding that this issue had been established as a matter of law on the undisputed facts, the court affirmed the summary judgment. (*Berger, supra,* at pp. 923-924.) There was no issue before the court in *Berger* analogous to the question before us of whether the Regional Team can qualify as an "employer" under California's statutory definition of that term.

any of the involved entities qualified as an "employer" under Labor Code section 3300.

The Labor Code definition of "employer" is quite specific about the nature of "public" employers. Unquestionably the Regional Team was not a "State agency" or "public [or] quasi public corporation," and the only question remaining is whether it was a "public agenc[y]" within the meaning of Labor Code section 3300.[9] We can find nothing in the record which even suggests that the Regional Team was a "public agenc[y]" within what we construe to be the meaning of Labor Code section 3300. As plaintiffs point out, the undisputed evidence established that the Regional Team had no office, property, employees, letterhead, phone number or any other indicia that it functioned as a "public agenc[y]." Clearly, the Regional Team was not an entity that could have been subjected to any claim for recompense because there would have been no way to contact "it." Under these facts, we agree with plaintiffs that the evidence presented below established as a matter of law that the Regional Team could not have been an "employer" of anyone within the meaning of Labor Code section 3300.

## C.   *Was Mountain View Brassinga's Special Employer?*

Mountain View's alternative theory is that the evidence either established as a matter of law that, or raised a triable issue of fact as to whether, Mountain View was Brassinga's special employer. Plaintiffs assert that the evidence established as a matter of law that (1) Brassinga was acting as a "volunteer," (2) even if Brassinga was a special employee of Mountain View, Mountain View would still be liable under *Marsh* and (3) Brassinga was not a special employee of Mountain View.[10] The trial court accepted all of plaintiffs' assertions.

---

[9]The Government Code states that " 'public agency' includes, but is not limited to, the federal government or any federal department or agency, this state, another state or any state department or agency, a county, county board of education, county superintendent of schools, city, public corporation, public district, or regional transportation commission of this state or another state." (Gov. Code, § 6500.) This nonexclusive definition of public agency for Government Code purposes tells us very little about the meaning of "public agencies" in Labor Code section 3300.

[10]Plaintiffs also argue that Labor Code section 3362.5 establishes that Brassinga was solely Palo Alto's employee. That statute provides that a person who is appointed to act as a reserve city police officer and "assigned specific police functions" by a city is an employee of the city "while performing duties as a peace officer." (Lab. Code, § 3362.5.) This statute tells us only that Brassinga was Palo Alto's employee if his duties could be characterized as those of a peace officer on May 15. There was never any dispute as to whether Brassinga was a Palo Alto employee. However, the statute is silent as to whether such an officer might also be a special employee of some other entity. As the statute is nonexclusive, it does not, in and of itself, preclude a conclusion that a reserve officer was, at some point, a special employee of an entity other than the one which appointed him or her.

### 1. *"Volunteer" Claim*

■ Plaintiffs convinced the trial court that Brassinga had been acting as a "volunteer" at the time of his death.

The term "employee" is defined broadly, and, ordinarily, "[a] person who renders service to another is presumed to be an 'employee.' " (*County of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 396 [179 Cal.Rptr. 214, 637 P.2d 681].) " 'Employee' means every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed . . . ." (Lab. Code, § 3351.) However, " '[e]mployee' excludes the following: [¶] . . . [¶] (i) Any person performing voluntary service for a public agency or a private, nonprofit organization who receives no remuneration for the services other than meals, transportation, lodging, or reimbursement for incidental expenses." (Lab. Code, § 3352.) The test of whether a person was providing "voluntary service" depends on whether the services were rendered for charitable or gratuitous reasons or for remuneration. (*Arriaga* v. *County of Alameda* (1995) 9 Cal.4th 1055, 1067 [40 Cal.Rptr.2d 116, 892 P.2d 150]; *Hoppmann* v. *Workers' Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1119, 1125 [277 Cal.Rptr. 116]; *Barragan* v. *Workers' Comp. Appeals Bd.* (1987) 195 Cal.App.3d 637, 649 [240 Cal.Rptr. 811].) "[T]he reality of the situation, not the parties' characterization of the relationship, controls the outcome." (*Hoppmann* v. *Workers' Comp. Appeals Bd.*, *supra*, 226 Cal.App.3d at pp. 1126-1127.)

It was undisputed that Brassinga was receiving hourly wages in return for acting as a role player for the May 15 Regional Team training exercises. Although the evidence disclosed that Brassinga could, but did not, decline his assignment by Palo Alto to this duty or Worley's request for his services during the training exercises, this did not establish that Brassinga was a "volunteer." The mere fact that an employee is given the freedom to decline a particular assignment does not mean that, when the employee accepts an assignment and engages in compensated work, he or she is transformed into a volunteer. Slavish obedience is not a requisite element of an employment relationship.

It is immaterial that Worley characterized his request for role players as seeking "volunteers." As *Hoppmann* explained, it is the reality of the relationship rather than the characterization of it by the parties that controls. The group of role players who responded to Worley's request included both Palo Alto and Mountain View employees. Unquestionably, the Mountain View employees who were, like Brassinga, being paid for their services as role

players when they responded to Worley's request, were not suddenly transformed into nonemployee volunteers when they responded to their supervisor's request for their services. In fact, a person who is being paid by his or her employer for his or her time at the time that the person provides services to a public agency could never fall within the exception stated in Labor Code section 3352, subdivision (i) unless that person's *employer* was donating its employee's services to the public agency.

The evidence in this case did not establish that *Palo Alto* was donating Brassinga's time to Mountain View at any time on May 15. Similarly, the evidence did not demonstrate that Brassinga, as a compensated employee, was free to make a unilateral decision to donate the time for which he was being compensated by Palo Alto to another entity. Therefore, the evidence did not establish as a matter of law that the role playing services Brassinga was providing at the time of his death were "voluntary services" within the meaning of Labor Code section 3352, subdivision (i).

### 2. *Marsh*

■ *Marsh* held that ". . . where the negligence of a special employee injures another of the special employer's workers, the victim is not barred by workers' compensation law from suing the general employer of the tortfeasor in negligence on respondeat superior principles." (*Marsh v. Tilley Steel Co.*, *supra*, 26 Cal.3d at p. 490.) Plaintiffs assert that this principle is applicable here to permit Brassinga to sue Acton's general employer, Mountain View, even if Brassinga was a special employee of Mountain View. Not so. In *Marsh*, the injured employee had no employment relationship whatsoever with the general employer of the tortfeasor. Consequently, the exclusive remedy provisions did not bar a tort action by the injured employee against the general employer of the tortfeasor. Here, if Mountain View was Brassinga's special employer, the exclusive remedy provisions would necessarily bar a tort action by Brassinga against Mountain View.

### 3. *Factual Dispute Whether Mountain View Was Brassinga's Special Employer*

#### a. *The Law*

■ The key to the existence of a special employment relationship is control. "[W]here the servants of two employers are jointly engaged in a project of mutual interest, each employee ordinarily remains the servant of his own master and does not thereby become the special employee of the other." (*Marsh v. Tilley Steel Co.*, *supra*, 26 Cal.3d at p. 493.) It is only

where some measure of control over the employee is relinquished by the employee's general employer to another entity that the other entity may become the employee's special employer. "In determining whether a special employment relationship exists, the primary consideration is whether the special employer has ' "[t]he right to control and direct the activities of the alleged employee or the manner and method in which the work is performed, whether exercised or not . . . ." ' . . . However, '[w]hether the right to control existed or was exercised is generally a question of fact to be resolved from the reasonable inferences to be drawn from the circumstances shown. . . .' " (*Kowalski* v. *Shell Oil Co., supra,* 23 Cal.3d at p. 175, citations omitted.)

Plaintiffs argue that a special employment relationship cannot be created unless the general employer relinquishes "all" control to the special employer and the special employer becomes solely responsible for the special employee's actions. They claim to find this principle of law in *Marsh.* ▪ "When an employer—the 'general' employer—lends an employee to another employer and relinquishes to a borrowing employer *all right of control* over the employee's activities, a 'special employment' relationship arises between the borrowing employer and the employee." (*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d at p. 492, italics added.) However, plaintiffs take this sentence out of context. *Marsh* itself made clear that relinquishment of "all" control is not necessary for creation of a special employment relationship. "Facts demonstrating the existence of a special employment relationship do not necessarily preclude a finding that a particular employee also remained under the *partial control* of the original employer. Where general and special employers *share control* of an employee's work, a 'dual employment' arises, and the general employer remains concurrently and simultaneously, jointly and severally liable for the employee's torts." (*Marsh, supra,* at pp. 494-495, italics added.) The point *Marsh* was making in the sentence relied upon by plaintiffs was that the general employer is absolved of respondeat superior liability when it relinquishes total control to the special employer but it is jointly and severally liable with the special employer in respondeat superior if it relinquishes only partial control to the special employer. The applicable legal principle is that a general employer's relinquishment of partial control over its employee to another entity may create a special employment relationship.[11]

▪ "The special employment relationship and its consequent imposition of liability upon the special employer flows from *the borrower's power*

---

[11]This principle was settled long before *Marsh,* and *Marsh* did not purport to overrule any of the prior California Supreme Court cases on this issue. "[I]t is settled that 'a general and special employment relationship is present if there exists *in each* some power, not necessarily complete, of direction and control.' " (*Industrial Ind. Exch.* v. *Ind. Acc. Com.* (1945) 26 Cal.2d 130, 135 [156 P.2d 926], italics added; *McFarland* v. *Voorheis-Trindle Co.* (1959) 52 Cal.2d 698, 704 [343 P.2d 923].)

*to supervise the details of the employee's work.* Mere instruction by the borrower on the result to be achieved will not suffice." (*Marsh* v. *Tilley Steel Co.*, *supra*, 26 Cal.3d at p. 492, italics added; *Kowalski* v. *Shell Oil Co.*, *supra*, 23 Cal.3d at pp. 176-178.) "The *right* to control and direct the activities of the alleged employee or the manner and method in which the work is performed, *whether exercised or not* gives rise to the employment relationship." (*Industrial Ind. Exch.* v. *Ind. Acc. Com.*, *supra*, 26 Cal.2d at p. 135, italics added; *McFarland* v. *Voorheis-Trindle Co.*, *supra*, 52 Cal.2d at p. 704.)

In addition to the alleged special employer's control over the employee, there are a number of other factors relevant to deciding whether a special employment relationship existed. The existence of a special employment relationship may be supported by evidence that (1) the alleged special employer paid wages to the employee, (2) the alleged special employer had the power to discharge the employee, (3) the work performed by the employee was unskilled, (4) the work tools were provided by the alleged special employer, (5) the work was part of the alleged special employer's regular business, (6) the employee expressly or impliedly consented to a special employment relationship, (7) the parties believed they were creating a special employment relationship, and (8) the alleged special employment period was lengthy. (*Marsh* v. *Tilley Steel Co.*, *supra*, 26 Cal.3d at pp. 492-493; *Kowalski* v. *Shell Oil Co.*, *supra*, 23 Cal.3d at pp. 176-178.) On the other hand, a special employment relationship may be negated by evidence that "[t]he employee is (1) not paid by and cannot be discharged by the borrower, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer." (*Marsh*, *supra*, at p. 492.)

"[S]pecial employment is most often resolved on the basis of *'reasonable inferences* to be drawn from the circumstances shown.' Where the evidence, though not in conflict, permits conflicting inferences, ' ". . . the existence or nonexistence of the special employment relationship barring the injured employee's action at law is generally a question reserved for the trier of fact." ' " (*Marsh* v. *Tilley Steel Co.*, *supra*, 26 Cal.3d at p. 493, first italics added.) ▮ "However, if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists becomes a question of law which may be resolved by summary judgment. . . ." (*Riley* v. *Southwest Marine, Inc.*, *supra*, 203 Cal.App.3d at p. 1248, citations omitted.)

b. *Summary Judgment*

▮ The first question is whether the superior court erred in denying Mountain View's motion for summary judgment. We conclude that it did not

because there was a triable issue of fact as to whether Mountain View was Brassinga's special employer.

The relevant factors other than control were mixed. Some favored the existence of a special employment relationship while others tended to negate the existence of a special employment relationship between Brassinga and Mountain View. It was not disputed that (1) the Regional Team training exercises were part of the regular business of the involved police departments, (2) Palo Alto, not Mountain View, paid Brassinga's wages on May 15, (3) the role playing services provided by Brassinga were unskilled, and (4) the alleged special employment period was brief. Although the parties argue about whether Mountain View could have complained to Palo Alto about Brassinga's work and caused him to be disciplined, it is not seriously disputed that Mountain View lacked the power to discharge Brassinga from his position as a Palo Alto reserve police officer. However, Mountain View did have the power to remove Brassinga from his role playing duties for Mountain View. The evidence established that the only tool used by Brassinga, a toy gun, was provided by Palo Alto, not Mountain View. Brassinga clearly consented to serve as a role player under Worley's supervision, but whether this action constituted consent to a "special employment relationship" was the subject of conflicting inferences. There was no evidence that Worley and Brassinga believed they were creating a special employment relationship.

On the key question of Mountain View's right or power to control Brassinga, the evidence was also mixed. Palo Alto had assigned Brassinga to help the Regional Team as a role player during the day's training exercise. Like Palo Alto, Mountain View also assigned some of its general employees to act as role players during the Regional Team's training exercise. Hence, Brassinga was one of a group of role players that included both Palo Alto employees and Mountain View employees. The Regional Team split up into two groups for the first portion of the training exercises. Regional Team commanders were in charge of each group. The role players, including Brassinga, initially worked with a group composed entirely of Palo Alto Regional Team members and supervised by a Palo Alto Regional Team commander. Subsequently, the role players agreed to serve in the same capacity for a group of Mountain View and Los Altos Regional Team members. Worley, a Mountain View Regional Team member, supervised the role players when they worked with the Mountain View group. Worley provided five to ten minutes of instructions to the role players at the outset and continued to give them instructions on how to perform their duties as the training progressed. Regional Team members from Palo Alto and Mountain View were also acting as role players at times for the Mountain View/Los Altos group.

The conflicting inferences that arose from these facts precluded summary judgment. A jury could have concluded that Worley did not have sufficient control over the details of Brassinga's discharge of his role playing duties to justify the creation of a special employment relationship between Brassinga and Mountain View. Similarly, the circumstances other than control were decidedly mixed. Although Brassinga was performing unskilled work that was part of Mountain View's regular business, Palo Alto was paying his wages and the period of the alleged special employment was very brief. Brassinga agreed to serve as a role player under Worley's supervision, but the only tool, a toy gun, was provided by Brassinga's general employer, Palo Alto. Mountain View had no power to discharge Brassinga from his Palo Alto reserve police officer position although it could discharge him as a role player for Mountain View. Because the evidence on the control issue was not definitive and could have supported conflicting inferences and the other factors also supported conflicting inferences, Mountain View had not established its defense on its motion for summary judgment, and the superior court did not err in denying its motion.

c. *Directed Verdict*

The next question is whether the disputed factual issues remained based on the trial evidence such that the trial court erred in granting plaintiffs a directed verdict on liability based on respondeat superior. We conclude that the question of whether Mountain View was Brassinga's special employer was not established as a matter of law based on the trial evidence, and the trial court therefore erred in granting a directed verdict on this issue.

As with the affidavits on the summary judgment motion, there was no dispute that (1) the Regional Team training exercises were part of the regular business of the involved police departments, (2) Palo Alto, not Mountain View, paid Brassinga's wages on May 15, (3) the role playing services provided by Brassinga were unskilled, and (4) the alleged special employment period was very brief. While Mountain View lacked the power to discharge Brassinga from his position as a Palo Alto reserve police officer, it did have the power to remove Brassinga from his role playing duties. The only tool used by Brassinga was provided by Palo Alto. Brassinga consented to serve as a role player under Worley's supervision, but whether this action constituted consent to a "special employment relationship" was the subject of conflicting inferences. There was no evidence that anyone believed a special employment relationship was being created. In sum, the factors other than control continued to be mixed based on the trial evidence.

Conflicting inferences could also have been drawn from the trial evidence regarding Mountain View's right or power to control Brassinga. Palo Alto

had assigned Brassinga to help the Regional Team as a role player during the day's training exercise. Like Palo Alto, Mountain View also assigned some of its general employees to act as role players during the Regional Team's training exercise. Consequently, there was a group of role players made up of Palo Alto employees and Mountain View employees. This group of role players first worked with a group composed entirely of Palo Alto Regional Team members and supervised by a Palo Alto Regional Team commander. Throughout his role playing duties, Brassinga was given instructions on how he should act.

After working with the Palo Alto group, the role players agreed to serve in the same capacity for a group of Mountain View and Los Altos Regional Team members. Regional Team members from Palo Alto and Mountain View joined the role players at times while they were working with the Mountain View/Los Altos group. The role players provided the same services to the Mountain View/Los Altos group that they had provided to the Palo Alto group. While working with the Mountain View/Los Altos group, the role players were "subject to the command" of and supervised by Worley. Worley gave them instructions on how to fulfill their role playing duties. He explained each scenario to the role players and told them how much of a challenge to provide and what type of behavior to engage in, but he allowed the role players to decide among themselves who would play which role and where to conceal themselves. Worley debriefed the role players after each scenario and gave them additional instructions.

The same conflicting inferences which precluded summary judgment precluded a directed verdict. The evidence presented at trial detailed above could have supported a jury finding that Worley's control over Brassinga's discharge of his role playing duties was indicative of the existence of a special employment relationship between Brassinga and Mountain View. The factors other than control could have supported either a finding of a special employment relationship or a finding that there was no special employment relationship. Brassinga's duties were unskilled and part of the regular business of Mountain View, but his wages were not paid by Mountain View and the period of the alleged special employment was brief. Brassinga consented to act as a role player for Mountain View, but the toy gun was provided by Palo Alto. Mountain View could discharge Brassinga from his role playing duties but not from his Palo Alto reserve police officer position. On this record, the trial court erred in directing a verdict in favor of plaintiffs on liability in respondeat superior. Consequently, we must reverse the trial court's judgment.

### D.   *Plaintiffs' Cross-appeal*

Plaintiffs appeal from the superior court's order granting Acton's motion for summary adjudication and dismissing him from this action. This

order was expressly based on the superior court's finding that the undisputed evidence established as a matter of law that the Regional Team was the employer of both Acton and plaintiff. As we have already discussed, the evidence presented below established that the Regional Team did *not* qualify as an "employer" under Labor Code section 3300. Acton's motion was based solely on the argument that he and Brassinga were co-employees of the Regional Team or of Mountain View. The undisputed facts do not support this argument. The Regional Team was not shown to be an entity that could qualify as an employer, and the evidence presented in support of Acton's motion did not establish as a matter of law that Mountain View was Brassinga's special employer. Consequently, the superior court erred in dismissing Acton from this action. The same triable issues of fact that precluded Mountain View from obtaining summary judgment precluded Acton from succeeding on his motion.

## DISPOSITION

The judgment is reversed and remanded for further proceedings in accordance with the views expressed herein. The parties shall bear their own costs.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied September 18, 1998.