James ANDERSON, Appellant,

v.

HOMELESS AND HOUSING COA; Donald G. Smith, Administrative Law Judge; and Larry Greathouse, Commissioner, Department of Workers' Claims, Appellees.

No. 2002–SC–1069–WC.

Supreme Court of Kentucky.

May 20, 2004.

Glenn M. Hammond, Kristie Goff, Pikeville, Counsel for Appellant.

H. Brett Stonecipher, Ferreri & Fogle, Lexington, Counsel for Appellee.

## OPINION OF THE COURT

KRS 342.650(3) exempts from coverage under Chapter 342 those individuals who perform services for a religious or charita-

ble organization in return for aid or sustenance only. The claimant was injured while working for the Homeless and Housing Coalition of Kentucky, Inc. (HHCK), helping to build houses for Habitat for Humanity. It was undisputed that HHCK was a charitable organization. Affirming an Administrative Law Judge's (ALJ's) decision, the Workers' Compensation Board (Board) and the Court of Appeals determined that the claimant received only aid or sustenance for his services and, therefore, was exempt from coverage. Having concluded that such a finding was unreasonable under the evidence, we reverse and remand the claim for further proceedings.

The claimant was born in 1938 and has a high school education as well as six months of computer training. He worked as a coal miner, gas station owner, supply clerk, painter, the owner of an instrument panels company, and for 21 years as a hardware store owner before becoming "burned out on business" and deciding that he "wanted to volunteer some time." The claimant thought that it was in August, 1997, that he contacted HHCK, applied to become an AmeriCorps volunteer, was accepted into the program, and signed a member participation agreement. He worked as a construction supervisor, overseeing as many as twenty other individuals. The claimant testified that he knew he would receive some payment for his services, but he did not remember being told about short term disability or other benefits. Although he was informed that he would be covered if he were hurt on the job, he admitted that he was not told specifically that it would be through workers' compensation. However, his understanding was that he would be covered by workers' compensation. Throughout his testimony, he referred to himself as a "volunteer."

On October 28, 1998, the claimant fell through a ventilation hole in the ceiling of a home on which he was working and injured his left knee, causing him to miss about a month's work. He continued working until his second term ended in August, 1999, at which time he became manager of the local YMCA, earning $18,000.00 per year. In July, 2001, he retired at the age of 62. He testified that he did so because the walking and climbing that were required had become too difficult and that he had neither worked nor sought employment since then. His medical expenses following the accident were paid by HHCK through an accidental medical expense insurance policy. The claimant's application of workers' compensation benefits listed only his spouse as a dependent.

Judith Levey, the Executive Director of HHCK, testified that the organization is a nonprofit corporation that receives and administers grants from the Department of Housing and Urban Development and from AmeriCorps. Its goal is to provide affordable housing for low-income Kentuckians. She testified that the claimant was a member of AmeriCorps, a national volunteer program, from October 7, 1997, through August 31, 1998, and from September 1, 1998, through August, 1999. Ms. Levey indicated that members of the program must undergo an application process and satisfy certain requirements as established by the National and Community Service Act of 1990. See 42 USCA § 12501, *et. seq.* Those who are accepted serve the community for one or two years through nonprofit corporations, public agencies, and faith-based organizations. The claimant applied and was accepted into the program, after which he completed a member participation agreement and was assigned to work with Pikeville Habitat for Humanity. He did so for two years.

Ms. Levey testified that the AmeriCorps participation agreement made it clear that members were not employees, were not working for wages, and received only a subsistence living allowance in exchange for their service to the sponsor site. Furthermore, project sponsors were required, by law, to agree not to assign members to activities that would displace individuals who would otherwise be employed at the site. Emphasizing that AmeriCorps was a volunteer service program, she testified that members were not considered to be employees and that occupational accidental death and dismemberment insurance was the only type that federal law required; however, HHCK also provided them with an accidental injury policy. She stated that HHCK, itself, had seven employees, two of whom worked part-time. They administered the federal funds, were paid a salary, and were covered by a workers' compensation insurance policy. She indicated, however, that the organization did not have sufficient funding to permit the purchase of workers' compensation insurance for AmeriCorps volunteers.

Ms. Levey testified that the stipend for AmeriCorps members at the relevant time was $8,340.00. It was paid by HHCK but funded by AmeriCorps. When asked why the claimant's W–2 for 1998 showed earnings of $15,652.08, she explained that Pikeville Habitat for Humanity provided HHCK with an extra $6,660.00, which increased his living allowance to $15,000.00, and that the remaining $652.08 may have been for mileage reimbursement. She stated that some sponsors provide extra funds for the living allowance because of difficulties in finding local housing or simply because the organization is able to provide additional help to the AmeriCorps member. When asked why the claimant's W–2 indicated that he was an employee, she responded that HHCK viewed him as being a volunteer who worked for aid and sustenance only.

Appended to Ms. Levey's deposition were copies of the agreements that the claimant signed on December 8, 1997, and July 20, 1998. Both agreements referred to the claimant as a "member." Among other things, they provided that a member was entitled to receive an annual taxable living allowance of $8,340.00 and applicable FICA, income taxes, and unemployment insurance; health care insurance; a child care allowance, if the member qualified; mileage and expense reimbursement and, in certain instances, an advance for travel, lodging and meals; occupational accidental death and dismemberment coverage; and, upon successful completion of the program, a taxable education award of $4,725.00. In return, the member agreed to provide 1,700 hours of service within the agreement's one-year period and to abide by certain rules of conduct.

KRS 342.640 provides, in pertinent part, as follows:

The following shall constitute employees subject to the provisions of this chapter, except as exempted under KRS 342.650:

(1) Every person, including a minor, whether lawfully or unlawfully employed, in the service of an employer under any contract of hire or apprenticeship, express or implied, and all helpers and assistants of employees, whether paid by the employer or the employee, if employed with the knowledge, actual or constructive of the employer;

. . .

(3) Every person in the service of the state or any of its political subdivisions or agencies, or of any county, city of any class, school district, drainage district, tax district, public or quasipublic corporation, or other political entity, under any contract of hire, express or implied, and every official or officer of those

entities, whether elected or appointed, while performing his official duties shall be considered an employee of the state...

(4) Every person performing service in the course of the trade, business, profession, or occupation of an employer at the time of the injury[.]

KRS 342.650 exempts certain "employees" from coverage, including:

(3) Any person performing services in return for aid or sustenance only, received from any religious or charitable organization.

Neither KRS 342.640 nor KRS 342.650 refers to the term "volunteer" or any of its variants.

Arguing that he was not exempt from coverage under Chapter 342, the claimant relies upon *Sears v. Oakwood Training Facility Department of Human Resources*, Ky.App., 623 S.W.2d 232 (1980), but that reliance is misplaced. *Sears v. Oakwood* concerned whether a participant in the federally-funded Foster Grandparent Program who worked at a Kentucky Department of Human Resources facility for mentally retarded children was covered by Chapter 342. Ms. Sears worked approximately 20 hours per week. She was paid $1.60 per hour, plus lunch and $1.00 per day for transportation. She maintained that her work was done "in the service of the state" and, therefore, that she was a covered employee under KRS 342.640(1) and (3). The Department asserted, however, that she was excluded from coverage by KRS 342.650(3) because she performed services for aid and sustenance only. Its argument was that she received only a "stipend" or reimburse-

ment for the out-of-pocket expenses she incurred as a volunteer. Furthermore, the money that she received was not subject to any tax or charge, and it was not treated as wages or compensation for the purpose of unemployment, temporary disability, retirement, public assistance, or any similar benefit or minimum wage law.[1] *Id.* at 234.

Although the fact-finder determined that Ms. Sears was not an employee within the meaning of KRS 342.640, the decision was reversed on appeal. Noting that the program in which Ms. Sears worked was administered through a Department employee, that the Department was a state agency, that Ms. Sears performed services under the direction of an Oakwood employee, that she was required to work twenty hours per week, that she was paid by the hour, and that her services were in keeping with the goal of the facility, the court determined that the evidence compelled a finding that she was an employee for the purposes of Chapter 342. The court found it insignificant that Oakwood provided Ms. Sears with an accident insurance policy and noted that KRS 342.630 required the state and its agencies to comply with Chapter 342. Having determined that Ms. Sears was the employee of a state agency and, therefore, that KRS 342.650(3) did not apply, the court did not address the Department's argument that the payments she received amounted to "aid or sustenance only."

Unlike Ms. Sears, the claimant does not argue that he was employed by a state agency. Furthermore, it is undisputed that HHCK is a non-profit charitable organization that provides low-income housing. Although KRS 342.640(4) covers "ev-

---

1. Current regulations governing the Foster Grandparents Program specify that foster grandparents are not employees of the federal government, sponsor, or volunteer station and that cost reimbursements of foster grandpar-

ents "are not subject to any tax or charge or treated as wages or compensation for the purposes of ... workers' compensation ..." 45 C.F.R. §§ 2552.44 and 2552.46 (2003).

ery person performing service in the course of the trade, business, profession, or occupation of an employer," KRS 342.650(3) excludes employees who work for a charitable organization "for aid or sustenance only." Therefore, if the ALJ reasonably determined that the claimant received "aid or sustenance only," he is excluded from coverage.

The claimant acknowledges that the Act does not define the term "for aid or sustenance only" but argues that it "means something much less than money, insurance benefits, health benefits, child care benefits, meals, lodging, travel, and unemployment insurance." He also argues that HHCK "made him an employee" by mandating how long and how much he would work, how much training he must complete, and how he must act while participating in the program, requirements that he asserts go beyond what is expected of a volunteer. Finally, the claimant asserts that because his contract with HHCK entitled him to receive unemployment insurance, an employer/employee relationship must have existed. KRS 341.050(e).

A purpose of the National and Community Service Act of 1990 is to encourage citizens, regardless of their age or income, to perform community service without displacing existing workers. See 42 U.S.C.A. § 12501(b). Participation is limited to one or two years. 42 U.S.C.A. § 12501(h). Full-time participants must contribute 1,700 hours of service within 9–12 months but may be released from the requirement for "compelling personal circumstances" or for cause. 42 U.S.C.A. § 12593. In such an instance, the amount of the living allowance is prorated. 42 U.S.C.A. § 12594(a)(4). During the period of service, they receive a living allowance and various benefits, and they are rewarded with an educational grant upon completion of their service. Unlike the stipend of Foster Grandparents, the living allowance is subject to certain state and federal taxes, including income tax, and is designed to provide an amount "sufficient to meet the necessary costs of living (including food, housing, and transportation) in the area in which the program is located." See 42 U.S.C.A. § 12594(a)(5)(B). In general, it ranges between the average annual subsistence allowance of a VISTA volunteer under section 105 of the Domestic Volunteer Service Act of 1973 and 200% of that allowance. 42 U.S.C.A. § 12594(a)(1) and (3). The average annual subsistence allowance of VISTA volunteers may not be less than 95% of the poverty line as defined by the Office of Management and Budget. 42 U.S.C.A. § 4955(b)(2)(A). The federal share of the AmeriCorps annual living allowance may not exceed 85% of the average provided to VISTA volunteers. 42 U.S.C.A. § 12594(a)(2). Child care benefits must be provided to enable participants who need such assistance to participate, and health insurance is also required. 42 U.S.C.A. § 12594(d) and (e).

We have found no clear indication that congress intended for the National and Community Service Act to preempt state workers' compensation law. Although 42 U.S.C.A. § 12511(17)(B) provides that an AmeriCorps participant "shall not be considered to be an employee of the program that receives assistance under this title," 42 U.S.C.A. § 12594(b) provides:

To the extent a national service program that receives assistance under section 12571 of this title is subject, with respect to the participants in the program, to the taxes imposed on an employer under sections 3111 [social security] and 3301 [unemployment] of Title 26 *and taxes imposed on an employer under a workmen's compensation act,* the assistance provided to the program under section 12571 of this title shall include an

amount sufficient to cover 85 percent of such taxes .... (Emphasis added.)

Thus, despite the mandatory language of 42 U.S.C.A. § 12511(17)(B), the Act appears to anticipate that at least some participants in national service programs will be covered by workers' compensation as well as by social security and unemployment insurance. Although a question concerning whether the Act preempted state workers' compensation law arose in *Twombly v. Association of Farmworker Opportunity Programs*, 212 F.3d 80, 84 (1st Cir. 2000), the court decided the case on the basis of the parties' contract and, therefore, found it unnecessary to reach the preemption issue. It observed, however, that the U.S. Department of Labor did not view AmeriCorps participants as being employees for federal unemployment compensation purposes but left it to the states to determine whether participants were eligible for state unemployment benefits. *See also, Dana v. American Youth Foundation*, 257 Mich.App. 208, 668 N.W.2d 174 (2003). We have located no authority to the contrary.

Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law*, §§ 65.00 and 65.01 (2003), explains that those who work gratuitously are not considered to be employees because there is no contract for hire. When determining whether work is truly gratuitous, payment may be found in anything of value, including food and shelter, and an agreement to pay is usually implied where there is no express agreement concerning payment. Where public-service or charitable duties are performed voluntarily and gratuitously, there is no presumption that payment is expected. The workers' compensation statutes of a number of jurisdictions exclude from coverage those individuals who work for charitable or religious organizations. *Id.* at § 72.04(1). Other statutes, such as Kentucky's, limit the exclusion to those who work for a charitable or religious organization and receive "aid or sustenance only" in return.

Our research indicates that the workers' compensation statutes of four other states exclude individuals who work "for aid or sustenance." Montana's statute does not limit the exclusion for those who work "for aid or sustenance only" to individuals who work for religious or charitable organizations. On the other hand, California, Maryland, and Washington have statutes that are either identical or nearly identical to KRS 342.650(3). Montana and California courts have construed the phrase "for aid or sustenance only."

The Montana Supreme Court has considered two cases and reached the opposite result. In *Carlson v. Cain*, 204 Mont. 311, 664 P.2d 913 (1983), the claimant was seriously injured in an automobile accident while delivering newspapers for her live-in fiancé who was employed by the newspaper as a route deliveryperson. The claimant was not paid for her work but received food, housing, and the use of an automobile from her fiancé, just as she had before she helped with the deliveries. Rejecting an assertion that the claimant was working "for aid or sustenance only," the Court determined that she had an implied contract for hire with her fiancé and expected benefits beyond those conferred by her living arrangement. Noting that she made the delivery run 3–4 times per week, that her work saved her fiancé $15–30 per night, and that she contributed "a good share of the work for which [he] brought in almost $6,500 per month," the Court upheld a finding that she was not excluded from coverage.

In contrast, in *Hammer v. Uninsured Employers' Fund*, 280 Mont. 371, 929 P.2d 883 (1996), the claimant was released from jail on the condition that she live with her

uncle. Her uncle insisted that she work for his construction firm "to earn her keep," and she was injured while doing so. Rejecting the claimant's argument that she was an employee and distinguishing *Carlson v. Cain, supra,* the Court explained that the claimant had no reasonable expectation that payment for her work would exceed room and board.

Several California cases have addressed the exclusion of certain individuals who worked for religious or charitable organizations. In *Hartford A. & I. Co. v. Industrial Accident Commission.,* 139 Cal.App. 632, 34 P.2d 826 (1934), the claimant sought a clothing donation from a charitable organization in exchange for which he was required to perform menial tasks for about two days at the rate of 25 cents per hour. After doing so, he was injured on the premises and sought workers' compensation benefits. Although noting that the exclusion for services to a charitable organization in return for aid or sustenance only had not become effective on the date of injury, the Court found another basis to exclude the claimant from coverage. Noting that charitable corporations or organizations whose sole aim was benevolent were exempt from statutes applying to individuals or ordinary business corporations, the Court determined that in the absence of statutory language creating workers' compensation liability in charitable corporations, it must be presumed that the legislature did not intend to create such liability.

In *State of California Subsequent Injuries Fund v. Industrial Accident Commission,* 196 Cal.App.2d 10, 16 Cal.Rptr. 323 (1961), the claimant was a mentally handicapped individual who worked in a sheltered workshop and was paid $2.50 per week. Noting that the claimant was paid by the piece, that he worked regular hours for five days per week, that he was penalized for lateness or absence, that he could quit or be discharged at any time, and that the workshop sold its product at a profit, the Court determined that there was an employment relationship between the claimant and the charitable organization that ran the workshop. Distinguishing *Hartford A. & I., supra,* the Court noted the extended period of the claimant's employment and the fact that he did not work to procure any specific article. Furthermore, noting testimony that the charitable organization considered him to be an employee and evidence that it may have paid a premium for workers' compensation coverage, the Court affirmed a finding in his favor.

In *Hoppmann v. Workers' Compensation Appeals Board,* 226 Cal.App.3d 1119, 277 Cal.Rptr. 116 (1991), the claimant was an indigent who was injured while doing renovation work for a church for which he was paid $5.00 per hour. He worked alongside paid licensed contractors, unpaid church volunteers, and persons like himself who were paid $5.00 per hour. Although he came to the church presenting a written resume and looking for work, he described himself as a "volunteer." The church's charitable program offered handouts to some indigent or homeless individuals but provided work for those who wished to maintain their dignity. It described the hourly payment as an "honorarium" and maintained that the claimant was not an employee on the ground that he worked "for aid or sustenance only."

The court determined that application of the "aid or sustenance" exclusion did not depend on whether payment was made in cash or in kind. Likening the exclusion to the "voluntary service" exclusion provided by another subsection of the California statute, the court explained that voluntary service was gratuitous and performed with no expectation of payment other than an

incidental reimbursement of expenses; whereas, service that was performed with the expectation of proportional compensation was not voluntary. Later, the court noted that the claimant worked shoulder to shoulder with covered employees. Addressing the question of whether work for a charitable organization at a low rate of pay was work for aid or sustenance only, the Court determined that where pay is above minimum wage and is not gauged by the recipient's necessities, it must be viewed as being wages. Furthermore, it rejected an argument that charitable organizations will be deterred from providing work for the needy if the recipients are treated as covered workers. The court's rationale was that the church received many hours of work from the claimant at $5.00 per hour and that if the cost of workers' compensation coverage was sufficient to deter its charity, it was easily discouraged.

Under KRS 342.0011(17) and KRS 342.140(6), the term "wages" takes into account items that are reported on the employee's income tax returns. It includes money; the reasonable value of board, rent, housing, lodging, fuel or other "similar advantage" from the employer; and any "gratuities received in the course of employment" from individuals other than the employer. As defined in the 1973 edition of *Webster's New Collegiate Dictionary*, the word "sustenance" refers to "means of support, maintenance, or subsistence." We conclude, therefore, that just as the value of non-cash advantages may be viewed as being "wages" for the purpose of Chapter 342, cash payments may be viewed as being "aid or sustenance." Regardless of whether an individual is paid in cash or in kind, the value of the compensation must be considered when determining whether the individual has received "aid or sustenance only" in return for work. Likewise, if an individual is compensated, it is immaterial under KRS 342.650(3) that the individual or the organization for which he works considers him to be a "volunteer." Payment for work constitutes "wages" if it is proportional to the type of work that is performed and not gauged by what is required for subsistence. At the other end of the spectrum, payment that amounts to a mere reimbursement of expenses or that is aimed at enabling an individual to subsist clearly may be viewed as being "aid or sustenance."

█ What income level is required to provide the necessities of life is open to debate. We note, however, that when the claimant was injured, the federal minimum wage was $5.15 per hour. The poverty threshold for a family of two was $10,972.00 or $10,850.00, depending upon whether the U.S. Census Bureau or the Department of Health and Human Services tables are used. The claimant's contract with HHCK required him to work 1,700 hours over a one-year period. In addition to health insurance, accidental death and dismemberment insurance, an education award, and various non-cash benefits, HHCK paid him a mileage reimbursement of $652.08 and a cash living allowance of $15,000.00. It is apparent, therefore, that the value of the payments he received in cash and in kind went far beyond what was necessary for him to subsist. Regardless of what might be the case with other AmeriCorps participants, it could not reasonably be said that the claimant worked for HHCK in exchange "for aid or sustenance only."

The decision of the Court of Appeals is reversed, and the claim is remanded to an ALJ for further consideration.

LAMBERT, C.J., and GRAVES, JOHNSTONE, STUMBO and WINTERSHEIMER, J.J., concur.

COOPER, J., dissents by separate opinion in which KELLER, J., joins.

COOPER, Justice, dissenting.

I dissent because federal law preempts us from construing our Workers' Compensation Act to create an employer/employee relationship between an AmeriCorps volunteer and the volunteer's AmeriCorps contracting agency, *e.g.,* Homeless and Housing Coalition of Kentucky (HHCK). AmeriCorps was created under the National and Community Service Act of 1990 (NCSA). 42 U.S.C. §§ 12501–12572. HHCK administered the AmeriCorps program in which claimant participated, and it is undisputed that HHCK received monetary assistance from AmeriCorps. 42 U.S.C. § 12511(17) provides:

(17) Participant

(A) In general

The term "participant" means—

(i) for purposes of division C of this subchapter, an individual in an approved national service position; and

(ii) for purposes of any other provision of this chapter, an individual enrolled in a program that receives assistance under this subchapter.

(B) Rule

*A participant shall not be considered to be an employee of the program in which the participant is enrolled.*

(Emphasis added.)

A situation similar to the case *sub judice* arose in *Twombly v. Ass'n of Farmworker Opportunity Programs,* 212 F.3d 80 (1st Cir.2000). The Maine Workers' Compensation Board, in the original action, held that 42 U.S.C. § 12511(17)(B) precluded it from considering an AmeriCorps participant as an employee of her AmeriCorps contracting agency. However, the United States Court of Appeals for the First Circuit held that the contracting agency was bound to uphold its part of the written agreement with the participant to provide a stipend and benefits including "health and medical coverage, child care if needed, [and] *worker's compensation." Id.* at 81, 85–86. (Emphasis added.) Appellant's contract with HHCK contains no such provision and Appellant admitted that no one told him that he would be covered by workers' compensation. Moreover, as required by the NCSA, HHCK provided Appellant with a basic health care policy, 42 U.S.C. § 12594(d)(1), which has paid benefits to Appellant.

Imposing a duty upon HHCK to provide Appellant with workers' compensation coverage by categorizing him as an employee of HHCK is preempted by the NCSA.

"[W]here the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard ..., states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations."

*Hines v. Davidowitz,* 312 U.S. 52, 66–67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (construing the Supremacy Clause, U.S. Const. art. VI, cl. 2). *See also Davis v. Elmira Sav. Bank,* 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896) (applying the Supremacy Clause). Thus, it was held in *United States v. Connors,* 634 F.Supp. 484 (S.D.Ohio 1985), that the preemption doctrine precluded Ohio from deeming participants in the Foster Grandparent Program employees for purposes of Ohio's Workers' Compensation Act in direct conflict with a provision of the Domestic Volunteer Services Act, 42 U.S.C. § 5058, which created the Foster Grandparents Program. *Id.* at 488–89. *See also Murray State Coll. v. Akins,* 794 P.2d 1218, 1220 (Okla.Ct.App.1990) (same).

The NCSA defines its purposes as follows:

(1) [M]eet the unmet human, educational, environmental, and public safety needs of the United States, without displacing existing workers;

(2) renew the ethic of civic responsibility and the spirit of community throughout the United States;

(3) expand educational opportunity by rewarding individuals who participate in national service with an increased ability to pursue higher education or job training;

(4) encourage citizens of the United States, regardless of age, income, or disability, to engage in full-time or part-time national service;

(5) reinvent government to eliminate duplication, support locally established initiatives, require measurable goals for performance, and offer flexibility in meeting those goals;

(6) expand and strengthen existing service programs with demonstrated experience in providing structured service opportunities with visible benefits to the participants and community;

(7) build on the existing organizational service infrastructure of Federal, State, and local programs and agencies to expand full-time and part-time service opportunities for all citizens; and

(8) provide tangible benefits to the communities in which national service is performed.

42 U.S.C.A. § 12501(b). Perhaps Congress believed that local AmeriCorps contracting agencies could not financially survive to accomplish these lofty goals if saddled with state workers' compensation insurance premiums. Regardless, Congress has occupied this particular field and preempted our authority to require HHCK to provide workers' compensation coverage for its volunteer participants.

Accordingly, I dissent.

KELLER, J., joins this dissenting opinion.